**UNITED STATES of America, Plaintiff–Appellee/Cross–Appellant,**

v.

**Johnnie Edgar WARWICK, Defendant–Appellant/Cross–Appellee.**

Nos. 97–5984, 97–6072.

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 9, 1998.

Decided Feb. 10, 1999.

Steve H. Cook (argued and briefed), Asst. U.S. Attorney, Office of the U.S. Attorney, Knoxville, TN, for Plaintiff–Appellee/Cross–Appellee.

Raymond A. Shirley, Jr. (argued and briefed), Knoxville, TN, for Defendant–Appellant/Cross–Appellee.

Before: SUHRHEINRICH, CLAY, & GILMAN, Circuit Judges.

## OPINION

CLAY, Circuit Judge.

Defendant, Johnnie Edgar Warwick, appeals the judgment of conviction and sentence entered by the district court on July 17, 1997, following the defendant's bench trial, whereby Warwick was convicted of, *inter alia,* three counts of using or carrying a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c). The government cross-appeals from the same judgment, by which the district court also found Warwick not guilty of an additional § 924(c) count. For the reasons set forth below, we **AFFIRM** the district court on both Warwick's appeal and the government's cross-appeal.

### I.

#### A. *Procedural History*

On December 3, 1996, a federal grand jury in the Eastern District of Tennessee returned a twelve-count indictment against Warwick charging him with eight counts of distributing marijuana in violation of 21 U.S.C. § 841(a)(1), and four counts of using or carrying a firearm during and in relation to drug-trafficking offenses in violation of 18 U.S.C. § 924(c).

Warwick agreed to a bench trial pursuant to Fed.R.Crim.P. 23(a). At the conclusion of proof, Warwick pled guilty to all counts charging him with distribution of marijuana, and the district court took the remaining four counts (3, 5, 8 and 12), charging violations of 18 U.S.C. § 924(c), under advisement. On July 17, 1997, the district court filed a judgment and accompanying memorandum finding Warwick guilty on counts 3, 5 and 8, but not guilty on count 12, inasmuch as "count 12[was] based on ... 'outrageous' conduct by the government" in violation of due process. This appeal and cross-appeal followed.

#### B. *Facts*

The facts are derived from trial testimony and transcripts of tape recordings of Warwick's meetings with an undercover officer that were admitted into evidence.

On November 5, 1996, Warwick met with an undercover police officer of the Knoxville Police Department. The officer, Lawrence Lipscomb, was posing as a "hit man," and Warwick was attempting to hire Officer Lipscomb to seriously injure two individuals. Warwick explained to Officer Lipscomb that he could not commit the assaults himself because he had been charged with first degree murder of a police officer and therefore must avoid any further trouble. Officer Lipscomb agreed to do the job, but requested that Warwick supply him with a firearm; after some hesitation, Warwick agreed.

On November 11, 1996, Warwick paged Officer Lipscomb to arrange a meeting at the old Hills Shopping Center in Knoxville (the "Shopping Center") at 11:45 a.m. When they met as planned, each man sought to establish that he was not a police officer: Warwick displayed newspaper clippings reporting that he had been a suspect in the murder of a police officer in 1989,[1] while Officer Lipscomb

---

1. In 1989, Warwick had been present when an off-duty Knoxville policeman was killed during what he believed to be a drug transaction gone bad. Indeed, a firearm owned by Warwick was the weapon used to kill the policeman. Howev-

displayed marijuana and cocaine and suggested that he was a drug dealer. Warwick then stated that he had access to marijuana and offered to sell some to Officer Lipscomb.

Warwick and Officer Lipscomb discussed the details of how they would conduct the marijuana transaction, particularly whether they would work alone or whether others would be there. Warwick twice expressed concern about getting "blown away" during the anticipated transaction. For example, Warwick told Officer Lipscomb, " I don't know you and you don't know me. I don't want to get blowed away."

Officer Lipscomb told Warwick that he had people working for him selling drugs, and Warwick stated that he had access to a wide variety of firearms that he could sell to Officer Lipscomb. They also discussed one type of gun in particular, a hammerless .38-caliber revolver, but Warwick indicated that he was going to obtain and keep that firearm for himself.

Warwick met with Officer Lipscomb eight more times before Warwick was arrested immediately following their last meeting on November 21, 1996. Warwick sold marijuana to Officer Lipscomb during each meeting, and the government contends that on four of these occasions Warwick used or carried a loaded firearm during and in relation to the marijuana sales.

### 1. Count 1, Distribution of Marijuana

Later in the day of November 11, 1996, Warwick and Officer Lipscomb spoke on the phone to arrange another meeting. Officer Lipscomb wanted to purchase both drugs and firearms, but Warwick stated that he would have only drugs for sale that day. After Officer Lipscomb insisted that Warwick needed to bring the guns, Warwick agreed to bring a Winchester 12-gauge shotgun from his home.

That evening, Warwick sold Officer Lipscomb several bags of marijuana (allegedly two pounds) in exchange for $1,500 and Officer Lipscomb's agreement to injure "Bootnose" Witt. Officer Lipscomb then asked

about the shotgun, and Warwick stated that it was in his truck. He also said it was the only shotgun in his house and that he had brought it with him solely at Officer Lipscomb's request. Warwick then sold the Winchester 12-gauge to Officer Lipscomb for $300.[2]

Officer Lipscomb subsequently discovered that the marijuana he had purchased weighed less than two pounds. To maintain his credibility as a drug dealer, Officer Lipscomb called Warwick to complain. Following a lengthy discussion, Officer Lipscomb proposed that Warwick provide him with six firearms as compensation for the marijuana shortage. Warwick declined this offer and instead promised that he would supply Officer Lipscomb with the missing marijuana. In subsequent telephone conversations, Warwick told Officer Lipscomb that he had the marijuana, and that he would have firearms with him that he would negotiate to sell. They agreed to meet later to conduct the transaction.

### 2. Count 2, Distribution of Marijuana, and Count 3, Firearm Offense

Warwick and Officer Lipscomb's next meeting took place on November 13, 1996, at approximately 12:30 p.m. Warwick first produced a quantity of marijuana that Officer Lipscomb agreed to accept to make up for the previous shortage.

Warwick then asked Officer Lipscomb if he wanted to "see a pretty piece," displaying an unloaded Jennings nine-millimeter semiautomatic pistol, which he handed to Officer Lipscomb. As Officer Lipscomb was inspecting the unloaded nine-millimeter pistol, Warwick removed from his pocket a Jennings .22-caliber semiautomatic pistol. This firearm, which had been in Warwick's possession throughout the drug trafficking offense, was loaded and had one round in the chamber. After the gun was unloaded, Warwick handed it to Officer Lipscomb. Officer Lipscomb twice asked Warwick if he carried one of the guns for protection; however, Warwick declined to say what he used for protection.

---

er, Warwick has never been charged with respect to that shooting.

**2.** This shotgun sale was not the subject of any charge in the indictment.

Warwick then sold the Jennings nine-millimeter semiautomatic pistol for $340 and the Jennings .22–caliber pistol for $100.

During the negotiation for the price of the guns, Warwick told Officer Lipscomb that he wanted to buy back the Winchester shotgun he had sold in the November 11 transaction. Specifically, he said that it "hurt [his] heart to get rid of [the shotgun]," and he reiterated that he had brought the shotgun and sold it only at Officer Lipscomb's insistence. However, Officer Lipscomb refused to sell the shotgun back to Warwick.

### 3. Count 4, Distribution of Marijuana, and Count 5, Firearm Offense

Later during the day of November 13, 1996, the two had several telephone conversations during which Officer Lipscomb asked about purchasing more marijuana and firearms. Warwick told Officer Lipscomb that he had more marijuana for sale, but that while he would be carrying a gun for himself, it would not be for sale.

Warwick and Officer Lipscomb met at the Shopping Center at approximately 10:45 p.m. that night. After Warwick asked for $600 in exchange for the marijuana, Officer Lipscomb displayed a "sawed-off" Remington Arms shotgun and offered to give Warwick the shotgun and $500 in exchange for the marijuana. After some hesitation, Warwick agreed, although he refused even to touch the weapon.[3]

At this point, Warwick asked that Officer Lipscomb obtain a gold necklace for him. When Officer Lipscomb promised to do so, Warwick became very emotional and began crying. After regaining his composure, Warwick pulled from his pocket the hammerless .38–caliber revolver that they had discussed several days earlier; Warwick wanted to show it to Officer Lipscomb. As Warwick was removing the loaded gun from his pocket, Officer Lipscomb asked whether the gun was his "protection," but Warwick did not respond. Warwick then unloaded the weapon and handed it to Officer Lipscomb. The following conversation took place:

LIPSCOMB: This is your personal one.

WARWICK: Uh huh.

LIPSCOMB: Alright, that's your, that's your protection right there.

WARWICK: Uh huh.

LIPSCOMB: Goddamn. You'll cap a motherfucker they get wrong with you.

WARWICK: What you say buddy?

LIPSCOMB: You cap a motherfucker they get wrong? What I'm saying, you got heart.

WARWICK: It's possible.

At trial, Warwick testified that he took the gun to the meeting because it was an unusual and fascinating weapon, and he wanted to show Officer Lipscomb the gun they had talked about earlier.

### 4. Count 6, Distribution of Marijuana

On the evening of November 14, 1996, Warwick sold Officer Lipscomb two more bags of marijuana and the same "sawed-off" Remington shotgun previously purchased from Officer Lipscomb. Upon completion of this transaction, Warwick revealed that he was armed only with a stun gun. Additionally, during the price negotiation, Officer Lipscomb gave Warwick a gold necklace and a toothpick. The toothpick was in response to Warwick's previous request that Officer Lipscomb give him a toothpick that was in Officer Lipscomb's mouth, so that Warwick could then place it in his own mouth as a sign of trust and friendship.

### 5. Count 7, Distribution of Marijuana, and Count 8, Firearm Offense

During a telephone conversation on November 18, 1996, Warwick told Officer Lipscomb that he had three more bags of marijuana to sell. During that conversation Warwick also described a fight he had been in the previous night. In discussing the fight, Warwick made the following comment: "Hell, no, he didn't fuck with me no more. I'd go . . . I had my goddamn knife and gun

---

**3.** Although bartering is one of the uses prohibited by 18 U.S.C. § 924(c), *Smith v. United States*, 508 U.S. 223, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993), Warwick was not charged with this offense.

both out, I'd go after my fuckin' or blowed him out one."

The two met early that afternoon. After Warwick produced the marijuana and the terms of the transaction were discussed, Officer Lipscomb asked Warwick about a gun he was expecting Warwick to get for him. Warwick stated that he had no gun to sell, but indicated that he was carrying a loaded firearm. Warwick then drew a fully loaded RG Model 39 .38–caliber revolver from his jacket pocket, and allowed Officer Lipscomb to inspect it. As Officer Lipscomb inspected the gun, Warwick took a knife from his pocket to show Officer Lipscomb. At this point in the conversation Warwick had the knife in his hand while Officer Lipscomb had the gun. The conversation then turned to the previous night's fight:

LIPSOMB: [L]et me tell you, look at this. I cut a mother fucker from here to here. I don't play that shit. That's a nice gun *right there,* man.

WARWICK: *Right there's* what I use if I have to. That mother fucker *right there.*

Officer Lipscomb testified at trial that as Warwick said, "Right there's what I use if I have to," Warwick was pointing to the gun in the officer's hand.

### 6. *Counts 9 and 10, Distribution of Marijuana*

Warwick and Officer Lipscomb met again on November 18, 1996, at 7:30 p.m., and Warwick sold Officer Lipscomb more bags of marijuana. When Officer Lipscomb attempted to determine whether Warwick was armed, Warwick stated that he was armed only with a stun gun, and that Officer Lipscomb could "shoot me if you want to."

When the two next met on November 20, 1996, Warwick brought with him marijuana and an unloaded firearm to sell. Officer Lipscomb purchased the marijuana but declined to purchase the gun. Officer Lipscomb was unable to determine whether Warwick was armed during this transaction.

### 7. *Count 11, Distribution of Marijuana, and Count 12, Firearm Offense*

On November 21, 1996, Warwick and Officer Lipscomb spoke on the telephone several times to arrange Officer Lipscomb's next marijuana purchase. Shortly before the transaction was to take place, Officer Lipscomb told Warwick that he did not have enough money to pay for the marijuana. Instead, Officer Lipscomb offered to exchange as partial payment for the next marijuana delivery the Winchester 12–gauge semiautomatic shotgun that Warwick had reluctantly sold to Officer Lipscomb for $300 on November 11, 1996, and that Warwick had requested to purchase back on November 13, 1996. Warwick agreed to accept the shotgun as partial payment for the marijuana.

Pursuant to the telephone conversation, the last meeting occurred early that evening. In anticipation of this meeting, the police had established surveillance units at several locations. One such unit was a van parked close to Officer Lipscomb's vehicle so the police could arrest and disarm Warwick as quickly as possible following the transaction.

When Warwick arrived at the meeting place, he entered Officer Lipscomb's vehicle and produced two bags of marijuana. In exchange, Warwick received $300 in cash and the Winchester shotgun (which he accepted in lieu of $100). Warwick then exited the vehicle and was approached by uniformed police, who informed him that he was under arrest and ordered him to get down. Warwick did not comply and police attempted to physically restrain him. During the ensuing struggle, Warwick lost control of the shotgun and unsuccessfully attempted to reach inside his jacket for his stun gun. The police eventually restrained Warwick and, pursuant to a search following his arrest, recovered Warwick's stun gun.

## II.

Warwick contends on appeal that the government did not present sufficient evidence to support a finding that he carried a firearm in relation to a narcotics sale as to each of counts 3, 5 and 8 of the indictment. The standard of review for challenges to sufficiency of the evidence is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential ele-

ments of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). "A defendant claiming insufficiency of the evidence bears a very heavy burden.... Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt." *United States v. Vannerson*, 786 F.2d 221, 225 (6th Cir.1986) (internal citations and quotations omitted).

Warwick denies that he brought firearms to the marijuana sales for protection. Instead, he claims that on two of the occasions (counts 3 and 8), he brought the firearms with the sole intention of selling them to the undercover officer, and that on the third (count 5), he brought the gun only to display to Officer Lipscomb an unique and fascinating weapon. Warwick argues that, as a result, these firearms were unrelated to the drug sales, and, therefore, his convictions on counts 3, 5 and 8 should be reversed. We disagree.

### A. Elements Of § 924(c)(1) Violation

Section 924(c)(1) imposes a minimum five-year term of imprisonment upon a person who "during and in relation to any crime of violence or drug trafficking crime ... uses or carries a firearm." Therefore, under § 924(c)(1), the government must prove that Warwick: (i) carried or used a firearm; (ii) during and in relation to a drug trafficking crime.

#### 1. Use Or Carry A Firearm

The government does not contend that Warwick "used" a firearm in connection with a marijuana sale as to counts 3, 5 and 8 of the indictment. However, Warwick does not dispute that he "carried" a firearm within the meaning of the statute during these marijuana sales. On each of these occasions Warwick had on his person a loaded firearm during the narcotics transaction. *See United States v. McRae*, 156 F.3d 708, 712 (6th Cir.1998) (upholding the defendant's conviction under "carry" prong of § 924(c), where the government presented evidence that the defendant had a rifle close enough to grab

and then physically transported the rifle and the drugs within the house).

#### 2. During And In Relation To A Drug Trafficking Crime

█ However, Warwick argues that the evidence was insufficient to prove that he carried the firearms "in relation to" the drug trafficking offenses, as required by statute. To establish that a firearm was carried "in relation to" a drug trafficking offense, the evidence must support a finding that the firearm furthered the purpose or effect of the crime and that its presence or involvement was not the result of coincidence. *See Smith v. United States*, 508 U.S. 223, 238, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993). Giving the "in relation to" element a broad reading, the Supreme Court concluded that the element is met if the gun facilitates or has the potential of facilitating the drug trafficking offense. *See id.*

█ Therefore, in determining whether a firearm was carried in relation to a narcotics sale, this Court does not focus solely on the defendant's specific intentions as he engaged in the drug trafficking offense. *See United States v. Brown*, 915 F.2d 219, 226 (6th Cir.1990). Rather, we examine "the totality of the circumstances surrounding the commission of the crime: the emboldened sallying forth, the execution of the transaction, the escape, and the likely response to contingencies that might have arisen during the commission of the crime." *See id.* Thus, a conviction under § 924(c)(1) will withstand appellate review if the evidence is sufficient to support a finding that the defendant intended to have the firearm available for use during or immediately following the transaction, or if it facilitated the crime by emboldening the defendant. *See id.* The defendant's sole purpose in carrying the firearm need not have been facilitation of the drug trafficking crime. *See id.*

### B. The Evidence Was Sufficient To Support Warwick's § 924(c) Convictions

█ We reject Warwick's argument that his § 924 convictions must be reversed as to counts 3, 5 and 8 of the indictment simply because he might have also carried the fire-

arms for the purpose of sale or display. Evidence that Warwick sought to sell or display these firearms does not preclude a finding that the firearms also were intended to facilitate the marijuana sales. "The fact that a gun is treated momentarily as an item of commerce does not render it inert or deprive it of destructive capacity. Rather, as experience demonstrates, it can be converted instantaneously from currency to cannon." *Smith*, 508 U.S. at 240, 113 S.Ct. 2050. *See also Brown*, 915 F.2d at 226 (stating that defendant's sole purpose in carrying the firearm need not have been facilitation of drug trafficking crime).

Our review of the record indicates that the cumulative evidence was sufficient for a rational trier of fact to find that Warwick carried the firearms in order to facilitate the marijuana sales so as to support a conviction under 18 U.S.C. § 924(c) as to each of counts 3, 5 and 8 of the indictment. The government presented evidence that (i) the firearms were loaded during each marijuana sale at issue; (ii) Warwick made statements indicating that he was prepared to use a firearm to protect himself; (iii) Warwick was well aware from personal experience of the potential need for firearm protection during a drug sale; and (iv) Warwick reached for a weapon when apprehended by the police.

First, Warwick does not dispute that on each of the three occasions he carried with him a *loaded* weapon during the marijuana transaction. Warwick unloaded the firearms only after completion of the narcotics transaction, before handing the guns over to the undercover officer for inspection or as part of a firearm sale. Because the sale or display of these weapons did not require that they be loaded, the fact that each weapon was loaded only before and during the narcotics transaction—when the marijuana was in Warwick's possession—supports a finding that these weapons were carried "in relation to" the narcotics transaction. *See, e.g., McRae*, 156

F.3d at 712 (finding that evidence that the defendant had a rifle and drugs together and close enough to grab when police entered the premises supported a finding that the rifle was used or carried "during and in relation to" a drug trafficking crime); *United States v. Washington*, 127 F.3d 510, 515 (6th Cir. 1997) (holding that a reasonable juror could infer that a firearm in the console of the defendant's car during a drug transaction made in the vehicle was carried "during and in relation to" the offense).[4]

Second, the government introduced statements made by Warwick indicating that, if endangered, he was prepared to use a firearm to protect himself. When discussing a fight he had the previous night, Warwick stated that had the fight continued, he would have "blowed [his opponent] out one." The government presented evidence that during that same conversation, after Officer Lipscomb stated, "[t]hat's a nice gun *right there*," Warwick gestured to the gun and stated: *"Right there's* what I use if I have to. That mother fucker *right there."* Warwick's comments suggest that if a narcotics transaction were to become threatening, he was prepared to respond with use of a firearm. *See, e.g., Fair v. United States*, 157 F.3d 427, 431 (6th Cir.1998) (holding that the evidence was sufficient to support a finding that the defendant carried a weapon "in relation to" the underlying narcotics transaction where his accomplice "had previously warned one of the undercover buyers that [the defendant] was not afraid to use his guns, clearly implying that [the defendant] would enforce the deal with violence if necessary").

Third, the government presented evidence that Warwick, from personal experience, was well aware of the potential need for firearm protection while conducting a narcotics sale. In 1989, Warwick had been present when a partner had used Warwick's gun to kill an off-duty police officer intruding on a drug

---

4. Indeed, the evidence as to count 8 indicates that Warwick intended neither to display nor sell the loaded gun he carried during the narcotics transaction. After Warwick produced the marijuana and the terms of the drug sale were discussed, Officer Lipscomb asked Warwick about a gun he was expecting Warwick to get for him. Warwick stated that he had no gun to sell, but

indicated that he was carrying a loaded firearm. Warwick then drew a fully loaded revolver from his pocket, and allowed the undercover officer to inspect it. Contrary to Warwick's assertion on appeal, this evidence does not indicate that Warwick carried the loaded gun in contemplation of a weapon sale, or that he brought the gun with the intention of displaying it to Officer Lipscomb.

transaction. During his second meeting with Officer Lipscomb, Warwick twice expressed concern about getting "blowed away" during the anticipated transaction, stating at one point: "I don't know you and you don't know me. I don't want to get blowed away." These facts support a finding that Warwick's conduct in carrying a loaded weapon during the narcotics transaction was not mere coincidence, but reflects Warwick's concern for his personal safety while conducting a drug sale.

Fourth, when Warwick was apprehended by the police, he reached into his pocket in an attempt to access the stun gun he was carrying. Although stun guns are not covered under § 924(c)(1), Warwick's action suggests that on those occasions when he was carrying a § 924(c) firearm, he was prepared to use it in an effort to evade arrest. *See, e.g., United States v. Wilson,* 884 F.2d 174, 177 (5th Cir.1989) (holding that the evidence was sufficient to show that the defendant's pistol was carried "in relation to" drug trafficking where, among other things, the defendant reached for his pistol when the police approached).

We believe that, viewed in the light most favorable to the prosecution, this evidence was sufficient to support a finding that Warwick carried a firearm "in relation to" a marijuana sale as to each of counts 3, 5 and 8. We are not persuaded by Warwick's contention that the evidence indicates that he was not carrying the guns out of fear of the undercover officer specifically. While Warwick was in possession of narcotics, anyone from an officer patrolling the beat to a rival dealer looking to attain more drugs posed a threat to Warwick. The government presented sufficient evidence for a rational trier of fact to conclude that Warwick carried these firearms, at least in part, to facilitate the marijuana sales to Officer Lipscomb. Indeed, the evidence indicates that these firearms at the very least had the potential of facilitating Warwick's drug trafficking offenses. The law requires no more. Accordingly, we affirm Warwick's § 924(c) convictions on counts 3, 5 and 8 of the indictment.

## III.

In its cross-appeal, the government contends that the district court improperly applied the "outrageous government conduct" defense to find Warwick "not guilty" of count 12, charging a § 924(c) violation.[5] We agree, but as set forth in Part IV, affirm the district court's dismissal of count 12 on entirely different grounds.

Count 12 of the indictment charged that Warwick exchanged marijuana for a Winchester 12–gauge shotgun during his last meeting with Officer Lipscomb on November 21, 1996. This is the same gun that Warwick had earlier sold to the undercover officer at Officer Lipscomb's insistence and that Warwick later repeatedly asked to purchase back because it had "broken his heart" to part with it. The district court found that, in light of these facts, the undercover officer's actions in inducing Warwick to accept the shotgun in exchange for marijuana constituted "outrageous government conduct" in violation of the Due Process Clause:

> Against this backdrop, the undercover officer, in the court's opinion, orchestrated a scenario whereby the defendant was forced to take the gun as partial payment for the marijuana. The undercover officer told the defendant that he did not have sufficient cash to pay for the marijuana, but would use the gun as partial payment. Remarkably, the undercover officer agreed to take only $100 for a gun [that] he had bought ten days earlier for $300. These facts exceed the boundaries of clever police work. They demonstrate, at best, overreaching by the government and, at worst, outrageous behavior by the government.... [T]his court is of the opinion

---

5. Although the district court's judgment entered a "not guilty" verdict as to count 12, we alternately refer to the district court's ruling as a dismissal of count 12. Prior cases concerning the outrageous government conduct defense suggest that the proper remedy would be to dismiss the indictment where conviction of the defendant, even if he was in fact guilty of the offense charged, would violate due process. *See, e.g., United States v. Tucker,* 28 F.3d 1420 (6th Cir. 1994); *United States v. Qaoud,* 777 F.2d 1105 (6th Cir.1985); *United States v. Leja,* 563 F.2d 244 (6th Cir.1977).

that it has been presented with governmental conduct [that] is outrageous and [that] shocks this court's conscience with respect to count 12 of the indictment. (J.A. at 60–61.) However, because this Court has expressly eliminated the "outrageous government conduct" defense in inducement cases such as the one at bar, we conclude that the district court improperly applied the "outrageous government conduct" defense to find Warwick "not guilty" under count 12 of the indictment.

## A. Legal Background

■ Under the outrageous government conduct defense, a defendant argues that the government's involvement in creating his crime (*i.e.*, the means and degrees of inducement) was so great "that a criminal prosecution for the [crime] violates the fundamental principles of due process." *United States v. Russell*, 411 U.S. 423, 430, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973). The defendant thus must establish that the police misconduct rises to the level of a constitutional violation.

■ The outrageous government conduct defense is distinct from the affirmative defense of entrapment, which requires the defendant to establish that he was not predisposed to commit the crime. *See United States v. Tucker*, 28 F.3d 1420, 1422 (6th Cir.1994). Under the outrageous government conduct defense, conviction may be improper even if the evidence establishes a predisposition to commit the crime: this defense looks only at the government's conduct and determines whether it is sufficiently outrageous so as to violate the Constitution. *See United States v. Sneed*, 34 F.3d 1570, 1576 (10th Cir.1994).

■ The availability of the "outrageous government conduct" defense is a question of law to be reviewed *de novo*. *See Tucker*, 28 F.3d at 1421. In *Tucker*, this Court expressly held that a defendant whose defense sounds in inducement cannot avail himself of the "outrageous government conduct" defense. We refused to recognize a defense "based solely on upon an objective assessment of the government's conduct in inducing the commission of crimes." *Id.* at 1426. We stated that, as a matter of law,

"government conduct [that] induces a defendant to commit a crime, even if labeled 'outrageous,' does not violate that defendant's constitutional right of due process." *Id.* at 1427.

Since *Tucker*, we have consistently rejected defendants' attempts to argue that the government's conduct in inducing them to commit the crimes charged was so outrageous as to deprive them of their constitutional rights. *See, e.g., United States v. Rogers*, 118 F.3d 466, 473 (6th Cir.1997) (noting that a defense that sounds in inducement is limited to entrapment and, under *Tucker*, does not implicate due process); *United States v. Branham*, 97 F.3d 835, 852 (6th Cir.1996) (noting that *Tucker* "rejected the 'due process' defense sounding in inducement," and therefore refusing to consider the defendant's claim of outrageous government conduct).

The district court acknowledged *Tucker* and its progeny, but instead seized upon language in *United States v. Pipes*, 87 F.3d 840 (6th Cir.1996). In *Pipes*, the defendant was arrested following a reverse sting operation during which he purchased forty-two pounds of marijuana from undercover officers. However, the officers had failed to comply with a state statute that requires prior judicial approval before seized contraband may be used in a reverse sting operation. The defendant argued that the officers' statutory violation constituted outrageous government conduct that violates due process.

Significantly, this Court in *Pipes* noted that the defendant raised no claim of inducement; he argued only that the officers' conduct in breaking the law was so outrageous as to violate due process. *See id.* at 842. This Court suggested that Supreme Court precedent "could be read to support a theory of due process that protects individuals from outrageous police conduct that shocks the conscience even if that conduct does not deprive individuals of a life, liberty, or property interest protected under the due process clause." *Id.* at 843. However, "before sanctioning such a novel and wide-ranging theory of due process," we found that, in any event,

the defendant had not "come close to alleging outrageous police conduct that shocks the conscience." *Id.*

The district court interpreted this language in *Pipes* to open the door to the "outrageous government conduct" defense where the court finds that the misconduct alleged shocks the conscience. Accordingly, the district court found Warwick "not guilty" on count 12.

## B. *The District Court Erred In Dismissing Count 12 Based Upon "Outrageous Government Conduct"*

We conclude that the district court erred in dismissing count 12 on this basis. This Court has expressly foreclosed the "outrageous government conduct" defense in cases where the defendant alleges inducement. Indeed, the district court acknowledged that this Court "has rejected the 'outrageous' government conduct defense in some circumstances." (J.A. at 60, citing *Branham,* 97 F.3d at 852, and *Tucker,* 28 F.3d 1420.) However, the district court failed to realize that the circumstances under which we have rejected the outrageous government conduct defense are the very circumstances present in this case—where the defendant's outrageous government conduct defense sounds squarely in inducement.

Warwick claims that Officer Lipscomb's conduct was outrageous not because it broke the law (as in *Pipes* ), but because the undercover officer's involvement in creating his crime was so significant that criminal prosecution violates due process. This is precisely the defense that this Court has refused to consider since *Tucker.* See, *e.g., United States v. Mack,* 53 F.3d 126 (6th Cir.1995) (refusing to consider the defendant's outrageous government conduct defense to a felon in possession of a firearm prosecution where the informant allegedly requested that the defendant bring a gun to a prearranged meeting). As a result, under the law of this Circuit, the district court was precluded from considering Warwick's due process defense of inducement in dismissing count 12 of the indictment.

## IV.

We nonetheless affirm the district court's ruling as to count 12. In response to the government's cross-appeal, Warwick argues that even if the district court erred in applying the "outrageous government conduct" defense, his mere receipt of the shotgun as payment for drugs did not constitute a "use" under § 924(c)(1). In *Bailey v. United States,* 516 U.S. 137, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995), the Supreme Court held that under § 924(c)(1) the government must present evidence sufficient to show *active employment* of the firearm by the defendant. *See Bailey,* 516 U.S. at 143, 116 S.Ct. 501. Warwick argues that his mere acceptance of the shotgun fell far short of "active employment," and, therefore, the evidence was insufficient to support a finding that he "used" a firearm within the meaning of the statute as to count 12.

We agree. We hold that Warwick's passive receipt of the shotgun from the undercover officer in exchange for marijuana did not constitute a "use" of a firearm within the meaning of § 924(c), where Warwick merely acquiesced to the undercover officer's proposal that he accept the firearm as partial payment for marijuana. The evidence establishes that Warwick accepted the shotgun exclusively at Officer Lipscomb's initiative. Warwick originally had arranged to provide the marijuana in question in exchange for a set cash amount, but Officer Lipscomb subsequently stated that he did not have sufficient cash under the original deal, and instead proposed to return Warwick's shotgun as partial payment.

We believe that Warwick's conduct with respect to count 12 does not fall within the active-employment understanding of "use" set forth in *Bailey.* The defendant in *Bailey* was convicted under the "use" prong of § 924(c)(1) based upon evidence that he had a gun in the trunk while transporting drugs and drug proceeds in his car. The Court looked to the word's commonly understood definitions to determine whether the defendant's conduct fell under the statute. "The word 'use' in the statute must be given its 'ordinary or natural' meaning, a meaning variously defined as '[t]o convert to one's ser-

vice,' 'to employ,' 'to avail oneself of,' and 'to carry out a purpose or actions by means of.' ... These various definitions of 'use' imply action and implementation." *Bailey,* 516 U.S. at 145, 116 S.Ct. 501 (quoting *Smith,* 508 U.S. at 228–29, 113 S.Ct. 2050) (internal citations omitted). The Court thus held that "924(c)(1) requires evidence to show an active employment of the firearm by the defendant, a use that makes the firearm an operative factor in relation to the predicate offense." [6] *Id.* at 143, 116 S.Ct. 501.

It does not appear that Warwick "used" or "actively employed" the shotgun under the ordinary or natural meanings of the terms. A defendant who does nothing more than accept a weapon offered to him by an undercover officer cannot be said to "actively" do anything with that weapon because receipt and acceptance is inherently passive conduct. In *United States v. Westmoreland,* 122 F.3d 431 (7th Cir.1997), the Seventh Circuit found that such passive receipt—particularly where the defendant did not introduce the gun into the transaction—does not constitute "active employment" of a firearm under the ordinary or natural meaning of the term. The defendant in *Westmoreland* was convicted under the "use" prong of § 924(c)(1) after accepting guns from an undercover officer in exchange for drugs. As here, the government agent introduced the gun into the transaction rather than the defendant requesting the gun as payment for the drugs. *See id.* at 436 n. 1. The court reasoned:

> Under *Bailey,* "use" requires some active employment of the firearm by the defendant. No matter how we phrase the events of this transaction, the defendant is on the passive side of the bargain. He received the gun. He was paid with the gun. He accepted the gun. But in no sense did he actively "use" the gun. If [the agent] had paid for the gun with a $100 bill, we would not say that [the defendant] "used" $100 in selling his gun to [the agent]. A seller does not "use" a buyer's consideration. The only person actively employing the gun in this transaction is the government agent. In fact, [the agent]

testified that he purposefully introduced the gun into the transaction for the purposes of setting up a conviction on the particular offense defined in section 924(c)(1).

*Id.* at 436.

Similarly, in the case at bar, the government presented no evidence that Warwick, himself, affirmatively utilized the shotgun in connection with the marijuana sale. In those cases where acquiring a firearm in exchange for drugs was held to constitute a "use" of the firearm under § 924(c)(1), the defendant was the one who actively devised the plan of providing drugs in exchange for firearms. *See United States v. Ulloa,* 94 F.3d 949, 955–56 (5th Cir.1996) (finding that the defendant "actively employed" firearms in connection with his drug trafficking offenses where he "required that he be furnished firearms in exchange for his drugs"); *United States v. Cannon,* 88 F.3d 1495, 1508–09 (8th Cir.1996) (finding that the "Defendants 'used' the machine gun when they proposed to the agents that the Defendants' drugs be traded for weapons, and then obtained the weapons in trade"). These defendants "actively employed" the firearms because they were the ones who injected the firearms into the equation in an effort to facilitate the drug trafficking crime.

However, the record of this case makes clear that Warwick did not propose any exchange of drugs and guns, but instead only agreed to Officer Lipscomb's last-minute proposal to accept the shotgun as partial payment for the marijuana. It was Officer Lipscomb, not Warwick, who "ma[de] the firearm an operative factor in relation to the predicate offense." *Bailey,* 516 U.S. at 143, 116 S.Ct. 501. Under these circumstances, we hold that Warwick's passive acceptance of the shotgun did not constitute a "use" within the meaning of § 924(c)(1), and, therefore, the district court properly dismissed count 12 of the indictment.

## V.

For the foregoing reasons, we AFFIRM both Warwick's convictions under counts 3, 5

---

**6.** The Court explained that while its active-employment understanding of "use" excludes mere possession, it includes "brandishing, displaying,

bartering, striking with, and most obviously, firing or attempting to fire, a firearm." *Id.* at 148, 116 S.Ct. 501.

and 8 of the indictment, and the district court's finding of not guilty of count 12 of the indictment.