NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0147n.06

**No. 19-2311**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA,** |  | **FILED** |
| Plaintiff-Appellee, |  | Mar 22, 2021 |
|  |  | DEBORAH S. HUNT, Clerk |
| v. |  | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| **ANDRE WATSON,** |  |  |
| Defendant-Appellant. |  |  |

**BEFORE:** CLAY, McKEAGUE, and MURPHY, Circuit Judges.

**CLAY, Circuit Judge.** Defendant Andre Watson was convicted by a jury on three counts: (1) use of interstate commerce facilities in the commission of a murder-for-hire, in violation of 18 U.S.C. § 1958(a); (2) conspiracy to possess with intent to distribute controlled substances, in violation of 21 U.S.C. §§ 846 and 841(1)(a); and (3) discharging a firearm during and in relation to a drug trafficking crime causing death, in violation of 18 U.S.C. §§ 924(c)(1) and (j). On appeal, Watson argues that § 1958(a) is unconstitutional as applied to him, that the district court provided the jury with incorrect instructions on the § 1958(a) count, and that the evidence was insufficient to sustain his convictions on the latter two counts. For the reasons set forth below, we **AFFIRM** Watson's convictions.

**BACKGROUND**

Darnell Bailey and Devin Wallace had been middle school friends. In 2013, they coincidentally met in a Walmart, and Bailey learned that Wallace, who was a drug trafficker and

dealer, owed a significant drug debt. Bailey, who had previously been convicted of several fraud schemes, then came up with a jointly operated tax fraud scheme that allowed Wallace to repay his debt.

Bailey and Wallace then began another illegal venture. Many drug dealers have sufficient cash to purchase or lease a car but lack the documented income required by car dealerships for these transactions. Bailey and Wallace solved this market failure by fraudulently using the personal information of Wallace's drug addicted customers to procure cars from dealerships that they then subleased to Wallace's drug dealer clients. Bailey and Wallace usually obtained cars from dealerships where they had a relationship with a salesperson—often the salesperson was one of Wallace's drug clients—because those salespeople would make the transaction easier by, for example, overlooking missing or deficient paperwork. Although the enterprise was lucrative, there was tension between Bailey and Wallace. According to Bailey, Wallace often "played a lot of games" with money that strained their relationship. (Trial Tr., R. 282 at PageID# 3097.)

Meanwhile, Deaunta Belcher, who was Bailey's cousin, was dealing drugs from a "dope house" on Beniteau Street in Detroit. (Trial Tr., R. 277 at PageID## 2536–37.) Stephen Brown sold drugs for Belcher, and, according to Bailey, Defendant Andre Watson served as an "enforcer" for Belcher. (Trial Tr., R. 283 at PageID# 3230.) After a chance encounter between Wallace and Belcher at a casino, Belcher was invited to join the car fraud scheme. Belcher's value add was his drug dealing contacts, which allowed the enterprise to expand beyond Wallace's clients, as well as his contacts at car dealerships. Bailey also hoped that Belcher's "street reputation" would encourage Wallace to stop playing games. (Trial Tr., R. 282 at PageID# 3104.) However, according to Bailey, Wallace's games with money did not stop, and Belcher did not get along with Wallace either.

Three incidents led to an escalation in the tension between Belcher and Wallace. First, Wallace intentionally provided low quality heroin to Belcher. Another issue arose after Bailey and Belcher purchased a couple of cars from a car dealership salesperson, who was one of Belcher's drug customers, "and sold them to a couple of Wallace people." (*Id.* at PageID# 3108.) The salesperson asked Bailey and Belcher to return the dealer license plates, and they called Wallace with the request. But Wallace kept stalling and took "a week or two to return them." (*Id.*) Bailey and Belcher were angry about Wallace's delay because they did not want to lose the dealership as a source of cars, and Belcher did not want to lose the salesperson as a drug customer. Finally, Wallace was indicted in federal court on drug charges. Following Belcher's subsequent arrest on state drug charges, Bailey and Belcher worried that Wallace was providing the government with incriminating information against them, although they "figured out later on that it wasn't him or . . . wasn't sure whether it was him or not." (*Id.* at PageID# 3111.)

In May 2015, Bailey and Belcher drove to Zeidman's pawnshop to meet with Watson and Brown. Upon arriving, Bailey stayed in the car while Belcher offered Watson and Brown a house and a car in exchange for killing Wallace. Bailey joined midway through the conversation and Brown asked him "where could he find Wallace at" to murder him. (*Id.* at PageID# 3115.) After the meeting at Zeidman's, Bailey was supposed to meet Wallace at a strip club in Dearborn. While Bailey went to a different strip club, Brown and Watson went to the Dearborn strip club to kill Wallace, but he escaped.

On September 11, 2015, Belcher and Bailey met Wallace at a car dealership. At the dealership, Bailey and Wallace "had an intense argument" about Belcher being at the dealership. (*Id.* at PageID## 3118–19.) Belcher and Bailey then met at a gas station and discussed having Wallace killed. As Belcher, Bailey, and Wallace had a previously scheduled meeting for that

afternoon, Belcher called Brown and told him that Wallace was going to be downtown with Bailey and that he would call back with more information. Brown then called Watson to let him know the news. Later, Belcher called back and told Brown that the location for the meeting was the They Say restaurant. Brown, Watson, and a third man, Billy Chambers, then drove towards the They Say restaurant.

Bailey was the first to arrive at the restaurant and, at some point, Wallace called to say that he was outside in his car. Bailey went to Wallace's car and began talking to him. Belcher then arrived with his daughter, but they left after a short time. Brown and Watson then received a call from Belcher letting them know to look for Bailey because he was standing outside of Wallace's car talking to him. When they arrived, according to Brown and Chambers, Watson got out of the car and shot Wallace. Responding law enforcement found Wallace dead in his car. At some later point, Bailey gave $2,000 to Watson for the killing.

Watson was charged with (1) use of interstate commerce facilities in the commission of a murder-for-hire, in violation of 18 U.S.C. § 1958(a); (2) conspiracy to possess with intent to distribute controlled substances, in violation of 21 U.S.C. §§ 846 and 841(1)(a); and (3) discharging a firearm during and in relation to a drug trafficking crime causing death, in violation of 18 U.S.C. §§ 924(c)(1) and (j). After a fourteen day trial, the jury returned a guilty verdict on all three counts. Watson received a mandatory life sentence for his conviction under § 1958(a), ten years of imprisonment for his conviction under §§ 846 and 841(1)(a), and another mandatory life sentence for his conviction under §§ 924(c) and (j). This appeal follows.

**DISCUSSION**

**I.      Constitutionality of § 1958(a) As Applied to Watson's Conduct**

Watson did not preserve this claim below, and "[t]his Court reviews unpreserved constitutional claims for plain error." *United States v. Dubrule*, 822 F.3d 866, 882 (6th Cir. 2016). "To establish plain error, a defendant must demonstrate: '(1) error, (2) that was plain, and (3) that affects substantial rights. If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affected the fairness, integrity or public reputation of the judicial proceedings.'" *United States v. Collins*, 799 F.3d 554, 574–75 (6th Cir. 2015) (quoting *United States v. Johnson*, 488 F.3d 690, 697 (6th Cir. 2007)).

"Section 1958(a) is a jurisdictional statute allowing federal prosecutors to bring specific types of state murder cases into federal court." *United States v. Johnson*, 443 F. App'x 85, 97 (6th Cir. 2011). To obtain a conviction under § 1958(a), the government was required to prove that Watson: (1) used or caused another to use a facility of interstate commerce; (2) "with intent that a murder be committed in violation of the laws of any State or the United States;" and (3) committed the murder "as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value." 18 U.S.C. § 1958(a); *see also United States v. Acierno*, 579 F.3d 694, 699 (6th Cir. 2009). As to the first element, the Superseding Indictment alleged that Watson "used and caused another to use a facility of interstate or foreign commerce, to wit: a telephone." (Superseding Indictment, R. 141 at PageID## 613–14.) Following the presentation of evidence, the district court instructed the jury that a "'facility of interstate commerce' includes . . . the use of a cellular telephone." (Trial Tr., R. 287 at PageID# 3828.)

Watson challenges § 1958(a)'s constitutionality to the extent that a cell phone can be considered a facility of interstate commerce. The Constitution provides Congress with the

authority to regulate "the instrumentalities of interstate commerce . . . ,"[1] *Taylor v. United States*, --- U.S. ---, 136 S. Ct. 2074, 2079 (2016) (quoting *United States v. Lopez*, 514 U.S. 549, 558–559 (1995)), and "[w]e invalidate statutes only if they bear no rational relationship to" this power, *United States v. Coleman*, 675 F.3d 615, 619 (6th Cir. 2012) (citing *United States v. Faasse*, 265 F.3d 475, 481 (6th Cir. 2001) (en banc)). Watson nonetheless argues that a cell phone cannot be included as an instrumentality of interstate commerce because "the risks of globally expansive federal jurisdiction" due to the "ubiquitous nature" of cell phones "may warp traditional notions of American federalism." (Appellant Br. at 42, 46.)

However, "[o]ur caselaw unequivocally holds that 'cellular telephones, even in the absence of evidence that they were used to make interstate calls, [are] instrumentalities of interstate commerce.'" *United States v. Dais*, 559 F. App'x 438, 445 (6th Cir. 2014) (quoting *United States v. Weathers*, 169 F.3d 336, 341 (6th Cir. 1999)); *see also United States v. Willoughby*, 742 F.3d 229, 240 (6th Cir. 2014) ("Willoughby's cell phone is such an instrumentality.") (overruled on other grounds); *United States v. Pina*, 724 F. App'x 413, 422–23 (6th Cir. 2018); *United States v. Wise*, 278 F. App'x 552, 561 (6th Cir. 2008).[2] In fact, Watson concedes that there is no case law supporting his position.[3] Therefore, there was no plain error. *See United States v. Al-Maliki*,

---

[1] Watson does not contest that "there exists 'no meaningful distinction between the terms 'facilities' and 'instrumentalities' of interstate commerce.'" *United States v. Runyon*, 707 F.3d 475, 489 (4th Cir. 2013) (quoting *United States v. Marek*, 238 F.3d 310, 317 & n.26 (5th Cir. 2001) (en banc)).

[2] Other circuits are in accord. *See United States v. Montijo-Maysonet*, 974 F.3d 34, 50 n.13 (1st Cir. 2020); *United States v. Taplet*, 776 F.3d 875, 882 (D.C. Cir. 2015) (holding that use of a cell phone "was sufficient evidence to show that Taplet used a facility of interstate commerce with the intent to commit a murder-for-hire."); *United States v. Morgan*, 748 F.3d 1024, 1031–32 (10th Cir. 2014); *United States v. Mandel*, 647 F.3d 710, 716 (7th Cir. 2011) (holding that the use of a cell phone satisfies the first element of § 1958(a)); *United States v. Evans*, 476 F.3d 1176, 1180–81 (11th Cir. 2007); *United States v. Giordano*, 442 F.3d 30, 40 (2d Cir. 2006); *United States v. Clayton*, 108 F.3d 1114, 1117 (9th Cir. 1997).

[3] Watson relies extensively on cases involving cell phones and the Fourth Amendment's warrant requirement. However, the Supreme Court's Fourth Amendment jurisprudence does not limit Congress's power to regulate the instrumentalities of interstate commerce. In fact, "[n]owhere in *Lopez* or any other

787 F.3d 784, 794 (6th Cir. 2015) (citing *United States v. Woodruff*, 735 F.3d 445, 450 (6th Cir. 2013)).

## II.    Jury Instructions Regarding the § 1958(a) Offense

Watson did not object to the district court's jury instruction that he now argues was erroneous and, in fact, his counsel expressly agreed with the district court's proposed instruction. Ordinarily, "[b]ecause [Watson] did not object to the jury instructions at trial, review is for plain error." *United States v. Harvey*, 653 F.3d 388, 395 (6th Cir. 2011) (citing *United States v. Vasquez*, 560 F.3d 461, 470 (6th Cir. 2009)). The government argues, however, that Watson's challenge to the jury instructions is unreviewable because this Court has held that "[a]n attorney cannot agree in open court with a judge's proposed course of conduct and then charge the court with error in following that course." *United States v. Sloman*, 909 F.2d 176, 182 (6th Cir. 1990). This Court recently confronted this exact issue—whether an express agreement by trial counsel with the district court's jury instructions makes any challenge to those instructions unreviewable—and held that "we need not declare a winner on the standard-of-review point" because the defendant's "claim fails even on plain-error review." *United States v. Buchanan*, 933 F.3d 501, 509 (6th Cir. 2019). Because Watson's claim also fails on plain error review, we similarly decline to decide this standard of review dispute.

As to the second element of § 1958(a)—which requires the government to prove that Watson had "intent that a murder be committed in violation of the laws of any State or the United States"—Count I of the Superseding Indictment alleged that Watson had "intent that the murder of Devin Wallace be committed in violation of the laws of the State of Michigan or the United States." (Superseding Indictment, R. 141 at PageID# 614.) When discussing the proposed jury

---

case has the Supreme Court limited Congress's regulatory authority to prevent the harmful use of an instrumentality of interstate commerce." *Morgan*, 748 F.3d at 1032; *see also Dais*, 559 F. App'x at 445.

instructions with counsel, in an effort to eliminate "stilted language," the district court recommended replacing the phrases "violation of Michigan law" and "first-degree murder in Michigan" with "violation of law" and "murder as defined by the law." (Trial Tr., R. 286 at PageID# 3665.) Both sides agreed with the district court's recommendation. Thus, when charging the jury on the § 1958(a) offense, the district court explained that the jury had to conclude beyond a reasonable doubt that Watson had "intent that a murder be committed in violation of the law." (Trial Tr., R. 287 at PageID# 3827.) The district court then provided the jury with the Michigan Model Criminal Jury Instruction's definition for first degree murder.

On appeal, Watson raises two issues with the district court's instructions. First, Watson contends that the district court's definition of murder was flawed because it did not include the element "that the killing was not justified, excused, or done under circumstances that reduce it to a lesser crime." Mich. Crim. J.I. 16.1(6). However, Watson never argued any defenses to his murder of Wallace, and the model instruction provides that this element "may be omitted if there is no evidence of justification or excuse, and the jury is not being instructed on manslaughter or any offense less than manslaughter." *Id.* n.4. Accordingly, the district court properly instructed the jury on what constitutes murder in violation of Michigan law.

Second, Watson argues that the district court's instructions constituted "an impermissible amendment and variance" from the Superseding Indictment. (Appellant Br. at 55.) "An amendment of the indictment occurs when the charging terms of the indictment are altered, either literally or in effect, by prosecutor or court after the grand jury has last passed upon them. A variance occurs when the charging terms of an indictment are left unaltered, but the evidence offered at trial proves facts materially different from those alleged in the indictment." *Martin v.*

*Kassulke*, 970 F.2d 1539, 1542 (6th Cir. 1992) (quoting *United States v. Ford*, 872 F.2d 1231, 1235 (6th Cir. 1989)); *see also United States v. Pritchett*, 749 F.3d 417, 428 (6th Cir. 2014).

The Superseding Indictment charged Watson with violating § 1958(a) and alleged that he had intent that Wallace's murder "be committed in violation of the laws of the State of Michigan or the United States." (Superseding Indictment, R. 141 at PageID# 614.) The district court's jury instruction stated that Watson had to have had "intent that a murder be committed in violation of the law," and the law provided to the jury was the definition of murder under Michigan law. (Trial Tr., R. 287 at PageID# 3827.) Therefore, both the Superseding Indictment and the jury instructions required the government to prove that Watson had intent to murder Wallace in violation of Michigan law. *See United States v. Davis*, 970 F.3d 650, 659 (6th Cir. 2020) ("The indictment did not thereby charge a different offense . . .."). Accordingly, neither an amendment nor a variance occurred in this case, and the district court's jury instructions were not plain error.

## III.    Sufficiency of the Evidence

"We review a challenge to the sufficiency of the evidence supporting a criminal conviction *de novo*." *Collins*, 799 F.3d at 589 (citing *Pritchett*, 749 F.3d at 430). A defendant "'bears a very heavy burden' in his sufficiency of the evidence challenge to his conviction." *United States v. Davis*, 397 F.3d 340, 344 (6th Cir. 2005) (quoting *United States v. Spearman*, 186 F.3d 743, 746 (6th Cir. 1999)). "In addressing sufficiency of the evidence questions, this Court has long recognized that we do not weigh the evidence, consider the credibility of witnesses or substitute our judgment for that of the jury." *United States v. Hilliard*, 11 F.3d 618, 620 (6th Cir. 1993) (citing *United States v. Evans*, 883 F.2d 496, 501 (6th Cir. 1989)). Instead, "[i]n evaluating such a challenge, we are tasked with determining 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of

the crime beyond a reasonable doubt.'" *Collins*, 799 F.3d at 589 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

A. Count II

Count II of the Superseding Indictment charged Watson with conspiracy to possess with intent to distribute controlled substances, in violation of 21 U.S.C. §§ 846 and 841(a)(1). "In order to establish a drug conspiracy in violation of 21 U.S.C. § 846, the government must prove, beyond a reasonable doubt, (1) an agreement to violate drug laws, (2) knowledge and intent to join the conspiracy, and (3) participation in the conspiracy." *United States v. Powell*, 847 F.3d 760, 780 (6th Cir. 2017) (cleaned up). "Once the existence of the conspiracy is proven, only slight evidence is needed to connect a defendant to the conspiracy" and "knowledge and intent to join the conspiracy may be inferred from [the defendant's] conduct and established by circumstantial evidence." *Id.* (citations omitted).

Watson does not dispute that there was sufficient evidence that Belcher and Brown were engaged in a conspiracy to distribute drugs. Instead, he argues that there were two separate conspiracies: one revolving around cars and one around drugs. According to Watson, he did not join the drug distribution conspiracy, and the evidence only proved his mere association with Belcher and Brown.

However, even assuming that there were two separate conspiracies, there was sufficient evidence for the jury to conclude that Watson knowingly and intentionally participated in the drug distribution conspiracy. To be sure, as Watson argues, no evidence established that he personally distributed drugs. However, Bailey's testimony established that Watson served as Belcher's "enforcer." (Trial Tr., R. 283 at PageID# 3230.) Watson argues that this testimony could mean that he was an enforcer for Belcher's car fraud activities and not his drug distribution activities. But

Bailey testified that he saw Watson with a gun at the house on Beniteau Street that served as Belcher's drug distribution headquarters. This evidence was sufficient for a rational jury to conclude beyond a reasonable doubt that Watson knowingly and intentionally participated in the drug distribution activities as an enforcer. *See United States v. Aviles-Colon*, 536 F.3d 1, 18 (1st Cir. 2008) (holding that evidence that a defendant was an "enforcer" was sufficient to convict him for participating in a drug conspiracy). Moreover, Brown explained that the original purpose of meeting Belcher at Zeidman's was to purchase marijuana for resale purposes. As Watson drove Brown to that meeting, the jury could infer that Watson was a participant in Belcher and Brown's drug distribution conspiracy. Accordingly, we affirm Watson's conviction under §§ 846 and 841(a)(1).

B. Count III

Watson also argues that the evidence was insufficient to support his conviction on Count III of the Superseding Indictment for using a firearm during and in relation to a drug trafficking crime causing death, in violation of 18 U.S.C. §§ 924(c)(1) and (j). "To make out a violation of § 924(c)(1), the government must prove beyond a reasonable doubt that the defendant '(i) carried or used a firearm; (ii) during and in relation to a drug trafficking crime.'"[4] *United States v. Cecil*, 615 F.3d 678, 692–93 (6th Cir. 2010) (quoting *United States v. Warwick*, 167 F.3d 965, 971 (6th Cir. 1999)). "To meet the 'during and in relation to' requirement, a firearm must have some purpose or effect with respect to the drug trafficking crime, and at least must facilitate, or have the potential of facilitating, the drug trafficking offense." *United States v. Layne*, 192 F.3d 556, 571 (6th Cir. 1999) (cleaned up); *see also Cecil*, 615 F.3d at 693. "We analyze that purpose and effect

---

[4] Section 924(j) provides for a penalty of death or life imprisonment when a violation of § 924(c) results in the murder of a person "through the use of a firearm." 18 U.S.C. § 924(j).

in terms of the 'totality of the circumstances surrounding the commission of the crime.'" *United States v. Ostrander*, 411 F.3d 684, 692 (6th Cir. 2005) (quoting *Warwick*, 167 F.3d at 971).

Watson does not dispute that he used a firearm to murder Wallace. But he argues that there was insufficient evidence showing that the murder was during and in relation to the drug distribution conspiracy. He asserts that Belcher's purpose for having Wallace murdered was to facilitate the car fraud scheme, not the drug distribution conspiracy.[5] However, even assuming the existence of two separate conspiracies, there was ample evidence that the murder had a purpose, at least in part, to further the drug trafficking activities. According to Bailey, one of the events motivating Belcher to murder Wallace was Wallace providing him with low quality heroin. Belcher was also angry about Wallace's failure to return the dealer plates from the cars he and Bailey purchased because he was worried that it would make him lose a drug customer. Therefore, there was sufficient evidence for a rational juror to conclude that the murder was during and in relation to the drug trafficking crime.[6]

## CONCLUSION

For the reasons stated above, we **AFFIRM** Watson's conviction on all counts.

---

[5] Watson also argues that Belcher's true purpose for ordering Wallace's murder was the fear that Wallace was cooperating with the Drug Enforcement Administration ("DEA"). However, trial testimony established that Bailey and Belcher did not believe that Wallace was implicating them in any crimes**.** Regardless, murdering Wallace to stop him from providing evidence to the DEA would have had the purpose of facilitating the drug distribution conspiracy.

[6] Watson argues that he lacked knowledge that the purpose of Wallace's murder was to further the drug trafficking activity. However, to sustain a conviction under § 924(c)(1), the government must only prove: (1) that the defendant committed a drug trafficking crime; (2) "[t]hat the defendant knowingly used or carried a firearm"; and (3) "[t]hat the use or carrying of the firearm was during and in relation to the [drug trafficking] crime"—*mens rea* is only required for the underlying drug trafficking crime and the use or carrying of a firearm. Sixth Circuit Pattern Jury Instructions, § 12.02; *see also United States v. Brown*, 915 F.2d 219, 224–25 (6th Cir. 1990).