UNITED STATES of America,
Plaintiff–Appellee,

v.

Joseph WESTMORELAND, also known
as Smoke, Defendant–Appellant.

No. 96–1217.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 19, 1997.

Decided Aug. 20, 1997.

Alejandro Menchaca (argued), Barry Rand Elden, Chief of Appeals, Office of the United States Attorney, Criminal Appellate Division, Chicago, IL, for Plaintiff–Appellee.

Michael G. Logan, Ashman & Stein, Christopher J. Callahan (argued), Chicago, IL, for Defendant–Appellant.

Before POSNER, Chief Judge, ROVNER and EVANS, Circuit Judges,

ILANA DIAMOND ROVNER, Circuit Judge.

A jury convicted Joseph Westmoreland of conspiracy to possess with intent to distribute crack cocaine, being a felon in possession of a firearm, attempt to possess with intent to distribute marijuana, distribution of crack cocaine, and using and carrying a firearm in relation to a drug trafficking crime. Westmoreland contends that the district court erred in instructing the jury on the conspiracy count, that there was insufficient evidence to convict him on the "use and carry" count, that the district court should have allowed him discovery on his selective prosecution claim, and that the sentencing disparity between cocaine base offenses and cocaine powder offenses is unconstitutional. We find no merit in Westmoreland's contentions regarding the jury instruction, the discovery issue and the sentencing disparity issue, but we agree that the evidence was insufficient to convict him of using a firearm in relation to a drug trafficking offense. We therefore reverse his conviction on that count and remand.

## I.

Westmoreland was a member of a street gang, specifically, the Undertaker Vice Lords. The main business of the gang was selling drugs, and Westmoreland was a dealer with substantial business. The gang confined their drug selling activities to a specific territory on the west side of Chicago, and mostly dealt heroin and cocaine, although they also sold marijuana as demand warranted. When the gang's supply of marijuana could not meet demand, the gang sought new sources and a confidential informant tipped law enforcement officers to the opportunity. Two undercover special agents from the United States Department of Treasury, Bureau of Alcohol, Tobacco and Firearms began meeting with Westmoreland and other gang members in order to investigate their activities. The agents posed as West Coast marijuana dealers. After purchasing smaller amounts of drugs from the defendant, Special Agent John Rotunno and his partner Special Agent Kimberly Morton arranged a larger deal. The Undertaker Vice Lords were to supply crack cocaine to the agents in exchange for marijuana, guns and cash, which was to be paid after the marijuana was sold. On the day of the exchange, Agent Rotunno handed over three pounds of marijuana and two guns to Westmoreland and another gang member. After a brief discussion about the quality of the marijuana and the use of the guns, Westmoreland's companion handed over eleven bags containing crack cocaine. Moments later, the agents signaled their backup units, who arrested Westmoreland and his cohort.

At trial, Westmoreland argued that there were two separate conspiracies and that he was not part of the conspiracy charged in the indictment. The court instructed the jurors that they could convict the defendant only of the conspiracy charged in the indictment, and only if they were convinced beyond a reasonable doubt that the defendant knowingly and intentionally joined the conspiracy charged. The court further clarified that the jury could convict even if it found Westmoreland guilty of two conspiracies, as long as it found beyond a reasonable doubt

that he was guilty of the single, overall conspiracy charged in the indictment. The court directed the jury to consider the nature of the agreement, and to convict only if the government proved an agreement on an overall goal. In deciding whether a single conspiracy existed, the court instructed that all the members need not know each other, and that members need not know what roles other members played. Different members could join at different times, there could be subgroups operating in different places, and the criminal acts could be committed over a long period of time. There could even be several agreements, as long as these agreements were not separate from the conspiracy "but reach[ed] for the common unlawful purpose of the conspiracy charged." The court directed that the controlling factor was whether the government proved an overall agreement on a common goal. Westmoreland objected to these instructions at trial as being argumentative. He offered an alternative instruction, which he argued was succinct, direct, and not confusing.

As for the "use and carry" count, the court instructed the jury that it could convict if Westmoreland was guilty of the marijuana attempt count or the crack distribution count and he "knowingly used or carried the firearm … in relation to" one or both of those two drug counts. Three months after the jury convicted Westmoreland on all counts, he filed a motion for discovery, alleging that the government was selectively prosecuting African Americans for crack cocaine related crimes. Westmoreland pointed to three other cases in the Northern District of Illinois involving indictments of African Americans for crack cocaine related offenses as the sole basis for his charge of selective prosecution. He also challenged his sentence on the grounds that the harsher penalties for crack cocaine violated various constitutional provisions. The district court rejected all of these arguments.

## II.

On appeal, Westmoreland challenges the conspiracy instructions as confusing and in conflict with the law. He also contends that the evidence offered at trial was insufficient to prove that he used a gun in relation to a drug trafficking offense because receiving a gun in payment for drugs is not conduct covered by the statute. Westmoreland also claims that he made a *prima facie* showing that his indictment was based on selective prosecution and that he should therefore have been allowed to conduct discovery in support of this claim. Finally, he contends that the sentencing disparity between crack cocaine crimes and powder cocaine crimes violates due process, equal protection, and the prohibition against cruel and unusual punishment. As we will show, only one of these contentions has any merit.

### A.

We turn first to the conspiracy instruction. The government argues that the defendant waived all objections to this instruction, except the claim that it is argumentative, by not raising these objections to the trial court. The defendant, in turn, claims that he preserved the objections by tendering his own instruction, which he characterized to the trial court as being succinct, direct and without confusion. He argues now that that characterization implied that the government's instruction was confusing, not direct and not succinct. We think this is a close case for waiver. When presenting his express objections to the government's instructions, Westmoreland stated only that it "number one, is not necessary; and, number two is argumentative." He failed to state that the government's instruction was an incorrect or confusing statement of the law. By merely claiming that his own instruction was succinct, direct and not confusing, he was not necessarily impugning the correctness of the government's instruction. The better course would have been for him to make these specific objections to the trial court in relation to the government's instruction, instead of making general statements in support of his own proffered instruction. *See United States v. Olano,* 507 U.S. 725, 731, 113 S.Ct. 1770, 1776, 123 L.Ed.2d 508 (1993) (the court reviews for plain error only any alleged defects not timely brought to the attention of the district court); *Stachniak v. Hayes,* 989 F.2d 914, 920 (7th Cir.1993) ("if a

party fails to make a specific, timely jury instruction objection during trial, an argument regarding that jury instruction is deemed to be waived for [the] purposes of appeal.").

■ But whether Westmoreland waived these objections or not, we find that he loses on the merits because the instructions are neither confusing nor incorrect. When we review jury instructions, we construe them in their entirety and not in artificial isolation. *Stachniak,* 989 F.2d at 920 (citing *New Burnham Prairie Homes, Inc. v. Village of Burnham,* 910 F.2d 1474, 1483 (7th Cir. 1990)). When we view the instructions as a whole, we find that they correctly state the law. In fact, most of the language to which defendant objects has been approved by this Court in prior decisions. *See* United *States v. Blanding,* 53 F.3d 773, 776 n. 2 (and accompanying text) (7th Cir.1995); *United States v. Gonzalez,* 933 F.2d 417, 438 (7th Cir.1991); *United States v. Paiz,* 905 F.2d 1014, 1020 n. 4 (7th Cir.1990), *cert. denied,* 499 U.S. 924, 111 S.Ct. 1319, 113 L.Ed.2d 252 (1991). Because Westmoreland raised the issue of separate conspiracies, it was appropriate for the court to instruct the jury on how to distinguish between a single conspiracy and multiple conspiracies, and under what circumstances the jury could convict the defendant even if it found he was part of more than one conspiracy.

### B.

■ Approximately three months after trial, Westmoreland moved for discovery on the issue of selective prosecution. Westmoreland points to three other cases in the United States District Court for the Northern District of Illinois where African American defendants have been indicted on charges relating to crack cocaine. In an argument that borders on the frivolous, he asks us to consider these cases *prima facie* evidence of selective prosecution, and to allow him to conduct further discovery. We agree with the government that Westmoreland waived his selective prosecution claim by not raising it before trial. *See United States v. Jarrett,* 705 F.2d 198, 204 (7th Cir.1983), *cert. denied,* 465 U.S. 1004, 104

S.Ct. 995, 79 L.Ed.2d 228 (1984). But even if he had not waived the claim, Westmoreland fails to come close to making a *prima facie* showing of selective prosecution. Three indictments charging African Americans for crack cocaine violations are not probative of selective prosecution in the absence of any showing of different treatment of similarly situated persons of other races. *See United States v. Armstrong,* —— U.S. ——, ——, 116 S.Ct. 1480, 1486, 134 L.Ed.2d 687 (1996) (to establish entitlement to discovery on claim of selective prosecution based on race, defendant must produce credible evidence that similarly situated persons of other races could have been prosecuted but were not). Westmoreland makes no claim, for example, that the government failed to prosecute Caucasians whom the government believed had committed crack cocaine offenses, or that the government exhibited any racial bias in determining whom to prosecute. In the absence of any evidence that would be probative of selective prosecution, the district court did not err in refusing to grant discovery. Westmoreland is not entitled to go on a fishing expedition.

### C.

Westmoreland also contests the constitutionality of the disparity in sentencing between cocaine powder offenses and crack cocaine offenses. Westmoreland wisely concedes that this Court has previously rejected these very same claims in other cases. *See Blanding,* 53 F.3d at 776. The only reason he offers in urging us to reconsider our prior holdings is that the Sentencing Commission has recently indicated it may reconsider the guidelines for drug offenses and eliminate the sentencing disparity between powder and crack cocaine offenses. But such a change is no reason for us to reconsider the current state of the law of sentencing. That the Commission may set a new, lesser penalty for crack cocaine offenses does not affect the constitutionality of the current sentencing scheme. We decline to reconsider our prior holdings.

### D.

■ Westmoreland's final claim is that the evidence was insufficient to convict him of

using a firearm in relation to a drug trafficking offense. Construing the facts in a light most favorable to the government because Westmoreland was convicted, we must assume that Westmoreland received the gun in partial payment for the cocaine he was providing to Special Agent Rotunno. Thus, he implicitly challenges whether receiving a gun in payment for drugs can ever be considered "using" a gun for the purposes of 18 U.S.C. § 924(c)(1). That section imposes a five year minimum term, to be served consecutively to any other sentence, upon any person who "during and in relation to any crime of violence or drug trafficking crime … uses or carries a firearm." At issue then is whether receiving a gun in payment for drugs constitutes a "use" under the statute.

■ "When a word is not defined by statute, we normally construe it in accord with its ordinary or natural meaning." *Smith v. United States,* 508 U.S. 223, 228, 113 S.Ct. 2050, 2053, 124 L.Ed.2d 138 (1993). In Smith, the Supreme Court referred to Webster's New International Dictionary of English Language and Black's Law Dictionary to discern the meaning of the word "use" in section 924(c)(1). Those sources defined "to use" as "to convert to one's service," "to employ," "to avail oneself of," "to utilize," or "to carry out a purpose or action by means of." 508 U.S. at 228–29, 113 S.Ct. at 2053–54. Using those definitions, the *Smith* Court decided that "using" included employing a gun as an item of barter as well as deploying it for its ordinary purpose as a weapon. Id.

Two years later, the Supreme Court again considered the meaning of the word "use" in the context of section 924(c)(1). *Bailey v. United States,* —— U.S. ——, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995). This time the issue was whether the statute encompassed mere possession of a firearm in relation to a drug trafficking offense or whether something more was required. The Court noted that "the word 'use' poses some interpretational difficulties because of the different meanings attributable to it." *Id.,* —— U.S. at ——, 116 S.Ct. at 505. Because of the different possible meanings, the Court looked to the context of the word in the statute and in the sentencing scheme. *Id.,* —— U.S. at —— –

——, 116 S.Ct. at 505–06. The Court concluded that to show "use" of a firearm, the government must show more than mere possession, and in particular must show "active employment" of the gun. *Id.,* 116 S.Ct. at 506. In reaching this conclusion, the Court considered again all of the dictionary meanings it had considered in *Smith.* All of the various definitions implied action and implementation, the Court reasoned. The Court found this requirement of active deployment harmonious with *Smith:*

> [O]ur decision today is not inconsistent with *Smith.* Although there we declined to limit "use" to the meaning "use as a weapon," our interpretation of § 924(c)(1) nonetheless adhered to an active meaning of the term. In *Smith,* it was clear that the defendant had "used" the gun; the question was whether that particular use (bartering) came within the meaning of § 924(c)(1). *Smith* did not address the question we face today of what evidence is required to permit a jury to find that a firearm had been used at all.

—— U.S. at ——, 116 S.Ct. at 508. The Court then held that the "active employment" requirement could be met by brandishing, displaying, bartering, striking with, firing or attempting to fire the firearm. The Court rejected a definition of "use" that encompassed inert presence or storage of a gun at or near the site of a drug crime. *Id.*

We must conclude under *Bailey* that passively receiving a gun from an undercover agent in payment for drugs cannot constitute a use under section 924(c)(1). When we consider, as did the Supreme Court in both *Bailey* and *Smith,* the ordinary or natural meaning of the word "use," we note that there is no grammatically correct way to express that a person receiving a payment is thereby "using" the payment. Under *Bailey,* "use" requires some *active* employment of the firearm by the defendant. No matter how we phrase the events in this transaction, the defendant is on the passive side of the bargain. He received the gun. He was paid with the gun. He accepted the gun. But in no sense did he actively "use" the gun. If Agent Rotunno had paid for the gun with a $100 bill, we would not say that Westmore-

land "used" $100 in selling his gun to Rotunno. A seller does not "use" a buyer's consideration. The only person actively employing the gun in this transaction is the government agent. In fact, Agent Rotunno testified that he purposefully introduced the gun into the transaction for the purposes of setting up a conviction on the particular offense defined in section 924(c)(1). Where the defendant does nothing more than receive the gun in payment from a government agent, we cannot conclude that the defendant "actively employed" the gun in the transaction.[1]

■ The government argues that even though Westmoreland was arrested moments after receiving the gun, for those moments, he was displaying the gun in relation to a drug trafficking crime. But again, we must disagree because at that point in the transaction, the gun was nothing more than the "inert presence" described in *Bailey.* A government agent had supplied an inoperable, unloaded gun to the defendant in place of currency. The defendant held the gun only as long as it took for backup agents to be alerted to approach and make the arrest. The mere presence of the gun is not enough under *Bailey*—— U.S. at ——, 116 S.Ct. at 506.

Nor do we think that our decision today creates a circuit split with the Fifth Circuit's decision in *United States v. Zuniga,* 18 F.3d 1254 (5th Cir.1994), *cert. denied,* 513 U.S. 880, 115 S.Ct. 214, 130 L.Ed.2d 142 (1994). Although the Fifth Circuit held that receiving a gun in payment for drugs constituted a use under section 924(c)(1), that decision preceded *Bailey.* At the time *Zuniga* was decided, the law of the Fifth Circuit allowed conviction under section 924 if a gun was merely present in relation to a drug trafficking crime. *See United States v. Singleton,* 16 F.3d 1419, 1423 (5th Cir.1994) (possessing a firearm in relation to car jacking satisfies

"use" prong of section 924); *United States v. Guerrero,* 5 F.3d 868, 872–73 (5th Cir.1993), *cert. denied,* 510 U.S. 1134, 114 S.Ct. 1111, 127 L.Ed.2d 422 (1994) (government need not show actual use, but only that the firearm could have been used in facilitating a drug trafficking crime, to meet the "use" prong of section 924). *Bailey* drastically altered the way we must interpret section 924. As the Court made clear in *Bailey,* if Congress had wanted to reach the mere presence or availability of a gun, it could have easily written the statute more broadly. *Bailey,* —— U.S. at ——, 116 S.Ct. at 508 ("If Congress had intended to deprive 'use' of its active connotations, it could have simply substituted a more appropriate term—'possession'—to cover the conduct it wished to reach."). We do not believe that the Fifth Circuit's position in *Zuniga* could withstand *Bailey.*

The government has not shown that Westmoreland actively employed the firearm or that he carried it in relation to a drug trafficking crime. The evidence presented at trial demonstrated, at best, that Westmoreland passively accepted the gun from a government agent in payment for drugs, and then was immediately arrested. Without active employment, and with a showing that Westmoreland merely held the gun for a moment after a government agent handed it to him and before he was arrested, we cannot sustain the conviction. We therefore vacate Westmoreland's conviction under section 924(c)(1) and remand for proceedings consistent with this opinion.

AFFIRMED IN PART, REVERSED IN PART AND REMANDED.

---

1. We might well have a different case had the transaction occurred between two defendants instead of between a government agent and a defendant. In that case, the government could conceivably charge the party receiving the gun with aiding and abetting the party supplying it. See *United States v. Golden,* 102 F.3d 936, 945 (7th Cir.1996) (aiding and abetting liability has been routinely applied in conjunction with section 924 to convict individuals of aiding and abetting in using or carrying a firearm). We also think significant the fact that the government agent introduced the gun into the transaction, rather than the defendant requesting the gun in payment for the drugs. But we need not decide the effect of those factors today, because no one disputes that a government agent was solely responsible for introducing the firearm into the transaction.