United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued February 16, 2001 Decided May 1, 2001 

 No. 00-3033

 United States of America, 
 Appellee

 v.

 Maurice Leo Stewart, 
 Appellant

 Appeal from the United States District Court 
 for the District of Columbia 
 (No. 91cr00593-03)

 Sandra G. Roland, Assistant Federal Public Defender, 
argued the cause for appellant. With her on the briefs was 
A. J. Kramer, Federal Public Defender. Jennifer M. Blunt, 
Assistant Federal Public Defender, entered an appearance.

 Mary B. McCord, Assistant U.S. Attorney, argued the 
cause for appellee. With her on the brief were Wilma A. 

Lewis, U.S. Attorney, at the time the brief was filed, John R. 
Fisher and Mary-Patrice Brown, Assistant U.S. Attorneys.

 Before: Williams, Sentelle and Rogers, Circuit Judges.

 Opinion for the Court filed by Circuit Judge Sentelle.

 Sentelle, Circuit Judge: Appellant Maurice Leo Stewart 
pleaded guilty to conspiring to distribute fifty or more grams 
of cocaine base, see 21 U.S.C. ss 841(a)(1), 841(b)(1)(A)(iii), 
846, and conspiring to obtain firearms during and in relation 
to a drug trafficking offense, see 18 U.S.C. ss 371, 924(c). In 
light of the Supreme Court's decision in Bailey v. United 
States, 516 U.S. 137 (1995), Stewart filed a collateral review 
motion challenging his conviction on the ground that his 
receipt of firearms was not a "use" under 18 U.S.C. s 924(c). 
The district court denied Stewart's motion, holding that a 
person who receives a gun in exchange for drugs "uses" the 
gun within s 924(c)'s meaning. For the reasons set forth 
below, we reverse and remand.

 I. BACKGROUND

 In the Spring of 1991, Maurice Stewart, Richard Shorter, 
and Damon Edwards sold crack cocaine to undercover police 
officers on a number of occasions. During one of those sales, 
Stewart and Shorter asked the officers about their plans for 
the weekend. When the officers told the suspects that they 
were "running guns," Stewart asked if he "could also get him 
an AK-47." One of the officers said that he would have to 
check with his cousin, who actually ran the guns.

 Several weeks later, during another drug sale, Stewart and 
Shorter "again brought up the possible purchase of the guns," 
asking the officers if they could buy two nine-millimeter guns 
for $500. Over the next week, the defendants finalized a deal 
with the officers. On May 10, Stewart and Shorter accompa-
nied the officers to a house in Northwest Washington, D.C., 
where the officers gave Gary Stewart, another of Maurice 
Stewart's co-conspirators, $7,000 in exchange for 250 grams 
of crack. At the time, the officers also agreed to give 
Maurice Stewart and the others a bag of guns as part of the 

transaction. Maurice Stewart and Shorter then accompanied 
the officers to another location, where the officers gave the 
guns to Stewart. Immediately, Stewart and Shorter were 
arrested. See United States v. (Gary) Stewart, 104 F.3d 
1377, 1380 (D.C. Cir. 1997).

 After a grand jury issued a seventeen count indictment 
against Stewart and his three co-conspirators, Stewart plead-
ed guilty to two counts: (1) conspiracy to distribute fifty or 
more grams of cocaine base, see 21 U.S.C. ss 841(a)(1), 
841(b)(a)(A)(iii), 846, and (2) conspiracy to obtain one or more 
firearms during and in relation to a drug trafficking crime, 
see 18 U.S.C. ss 371, 924(c). The district court sentenced 
Stewart to 188 months imprisonment on the first count and 60 
months imprisonment on the second count. The court or-
dered that the two sentences be served concurrently and 
followed by five years of supervised release. On direct 
appeal, this Court affirmed Stewart's sentence. See United 
States v. (Maurice) Stewart, 36 F.3d 127 (D.C. Cir. 1994) 
(unpublished table decision).

 Following the Supreme Court's decision in Bailey v. United 
States, 516 U.S. 137 (1995), Stewart filed a collateral review 
motion under 28 U.S.C. s 2255 challenging his conviction on 
the ground that his passive receipt of the guns was not a 
"use" under 18 U.S.C. s 924(c). The district court denied 
this motion, holding that "selling drugs in exchange for guns 
clearly constitutes 'use' within the meaning of s 924(c)." 
United States v. Stewart, Crim. No. 91-593, mem. at 4 
(D.D.C. Mar. 10, 2000). Stewart appeals from that decision.

 II. ANALYSIS

 By failing to challenge the validity of his plea in his direct 
appeal, Stewart procedurally defaulted the claim he now 
makes. See Bousley v. United States, 523 U.S. 614, 622 
(1998). Stewart can raise his claim on collateral review only 
if he "can first demonstrate either cause and actual prejudice 
or that he is actually innocent." Id. (citations and internal 

quotations omitted).1 We begin by noting that the district 
court did not consider whether Stewart's procedural default 
could be excused. Rather, it held that Stewart was not 
entitled to relief because his claim was "meritless." Stewart, 
mem. at 3. We therefore limit our review to the legal 
question presented in Stewart's habeas corpus motion, setting 
aside the questions of whether his procedural default may be 
excused and whether Stewart should ultimately obtain relief.

 At the time of Stewart's arrest, 18 U.S.C. s 924(c)(1) 
provided: "Whoever, during and in relation to any ... drug 
trafficking crime ... uses or carries a firearm, shall, in 
addition to the punishment provided for such crime ..., be 
sentenced to imprisonment for five years." Several months 
after Stewart pleaded guilty, this Court issued its decision in 
United States v. Harris, 959 F.2d 246 (D.C. Cir. 1992) (per 
curiam). The Harris defendants had been convicted of violat-
ing s 924(c)(1) by receiving guns in exchange for drugs. The 
defendants appealed their convictions, arguing that the guns 
were not used "in relation to" a drug crime because they were 
used as "a medium of exchange in a trade for drugs and not 
as offensive or defensive weapons." Id. at 261. We rejected 
this argument and held that s 924(c) "requires no more than 
that the guns facilitate the predicate offense in some way." 
Id. Specifically, we explained that "this requirement is met 
'[i]f the firearm is within the possession or control of a person 
who commits an underlying crime ..., and the circumstances 
of the case show that the firearm facilitated or had a role in 
the crime.' " Id. (quoting United States v. (Richard) Stewart, 
779 F.2d 538, 540 (9th Cir. 1985)). We concluded that "once 
the [firearm] passed into appellants' hands the facilitative 
nexus was satisfied." Id.

 The following year, in Smith v. United States, 508 U.S. 223 
(1993), the Supreme Court upheld the conviction of a defen-

__________
 1 Although the motion we review in this case is Stewart's second 
motion for collateral review, the limitations established by the 
Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 
104-132, s 105, 110 Stat. 1214, 1220, do not apply because Stewart 
filed the present motion two days before the Act's effective date.

dant who had traded a gun for drugs. Id. at 225. The Smith 
Court held that "one who transports, exports, sells, or trades 
a firearm 'uses' it" in violation of s 924(c)(1). Id. at 234-35. 
In arriving at this holding, the Court described a number of 
different "everyday meaning[s]" for "use," including: "to 
employ," "to avail oneself of," and "to derive service from." 
Id. at 228-29 (internal quotes omitted). In light of these 
definitions, the Court explained that the Smith defendant had 
used a gun as "an item of barter ... to bring him the very 
drugs he sought." Id. at 229. Echoing our decision in 
Harris, the Court noted that "the gun at least must 'facili-
tat[e], or ha[ve] the potential of facilitating,' the drug traffick-
ing offense." Id. at 238 (quoting (Richard) Stewart, 779 F.2d 
at 540).

 Two years later, the Supreme Court issued its Bailey 
decision, which "clarif[ied] the meaning of 'use' under 
s 924(c)(1)." 516 U.S. at 142. In Bailey, the Court held that 
"s 924(c)(1) requires evidence sufficient to show an active 
employment of the firearm by the defendant, a use that 
makes the firearm an operative factor in relation to the 
predicate offense." Id. at 143. In its discussion, the Court 
again emphasized that "use" should be "given its 'ordinary 
and natural' meaning." Id. at 145 (quoting Smith, 508 U.S. at 
228). Distinguishing between the terms "use" and "carry" in 
s 924(c)(1), the Court explained that "a firearm can be used 
without being carried, e.g., when an offender ... barters with 
a firearm without handling it." Id. at 146. The Court 
underscored that its decision "is not inconsistent with Smith," 
explicitly recognizing that the "active-employment under-
standing of 'use' certainly includes ... bartering." Id. at 148.

 In Bailey's wake, five of our sister circuits have considered 
whether a person who receives a gun in exchange for drugs 
"uses" the gun within the meaning of s 924(c). Three of 
those circuits have held that a receiving defendant uses the 
gun, see United States v. Ramirez-Rangle, 103 F.3d 1501, 
1506 (9th Cir. 1997); United States v. Ulloa, 94 F.3d 949, 956 
(5th Cir. 1996); United States v. Cannon, 88 F.3d 1495, 1509 
(8th Cir. 1996), while two have held that he does not, see 
United States v. Warwick, 167 F.3d 965, 975-76 (6th Cir. 

1999); United States v. Westmoreland, 122 F.3d 431, 435 (7th 
Cir. 1997).

 Consistent with the "ordinary meaning" approach employed 
by the Supreme Court in Smith and Bailey, we cannot see 
how a defendant "uses" a gun when he receives it during a 
drug transaction. The recipient has not employed the gun, 
availed himself of the gun, or derived any service from the 
gun by simply trading his drugs for it. Cf. Smith, 508 U.S. at 
229. Indeed, nothing in a person's acceptance of a gun 
embodies the active employment demanded by the Court in 
Bailey. See 516 U.S. at 142. We therefore agree with the 
Sixth and Seventh Circuits that a person who receives a gun 
in a trade for drugs has not used the gun in violation of 
s 924(c).

 As the Seventh Circuit succinctly stated in United States v. 
Westmoreland, "there is no grammatically correct way to 
express that a person receiving a payment is thereby 'using' 
the payment." 122 F.3d at 435. Quite simply, a "seller does 
not 'use' a buyer's consideration." Id. at 436. For example, 
when a person pays a cashier a dollar for a cup of coffee in 
the courthouse cafeteria, the customer has not used the 
coffee. He has only used the dollar bill. We see no differ-
ence when a person pays for a gun with drugs.

 In response to Stewart's motion, the Government contends 
that Harris is still the law of this Circuit. This contention is 
based on the Supreme Court's statement that our Harris 
decision came to the "same conclusion" as the Eleventh 
Circuit decision the Court affirmed in Smith. 508 U.S. at 
227. While the Government's suggestion may be alluring, the 
interpretation of "use" we employed in Harris does not 
survive after Bailey.

 In making this argument, the Government essentially asks 
us to interpret Smith more broadly than the Court itself did 
in Bailey. The Bailey Court carefully noted that its holding 
was "not inconsistent" with the interpretation it announced in 
Smith. 516 U.S. at 148. The Court, however, explained that 
the Smith decision addressed only "whether that particular 
use (bartering) came within the meaning of s 924(c)(1)." Id. 

(emphasis added). Indeed, the Smith Court only "con-
clude[d] that using a firearm in a guns-for-drugs trade may 
constitute 'us[ing] a firearm' within the meaning of 
s 924(c)(1)." 508 U.S. at 237 (emphasis added). The Bailey 
Court explained that this conclusion "adhered to an active 
meaning" of the word "use" because "it was clear that the 
defendant had 'used' the gun." 516 U.S. at 148. In fact, the 
Smith Court made clear that the defendant had " 'used' his 
MAC-10 in an attempt to obtain drugs by offering to trade it 
for cocaine." 508 U.S. at 228. There is no similar way to say 
that the recipient of a gun has "used" the gun when he offers 
to trade his drugs for it. Neither Smith nor Bailey conclud-
ed that receiving a firearm in a drugs-for-guns trade consti-
tutes using a firearm. In this case, Stewart bartered for a 
firearm, he did not barter with a firearm like the Smith 
defendant. See United States v. Ulloa, 94 F.3d 949, 958 (5th 
Cir. 1996) (Politz, J., dissenting). Accordingly, neither Bailey 
nor Smith foreclose Stewart's claim, and, read together, those 
decisions foreclose the possibility that Harris is still viable.

 As the Government correctly notes, the Bailey Court did 
list "bartering" as an example of an activity that "fall[s] 
within 'active employment.' " 516 U.S. at 148. But that 
language by the Supreme Court must be taken in context. 
The Supreme Court included "bartering" in a list of examples 
of active employments that might fall within the s 924(c)(1) 
definitions of "use." The Supreme Court did not purport to 
be encompassing every possible situation involving barter as a 
violation of that statute. Significantly, that discussion fol-
lowed the Court's analysis of Smith, in which the defendant's 
use of a firearm had been the trading of it for drugs. In 
context, therefore, the Supreme Court's understanding of 
Congress's intent to afford the term "use" its "active connota-
tion," id. at 148, includes situations in which a defendant 
barters a firearm in return for drugs. The Supreme Court's 
inclusion of the word "bartering" in the list of active uses 
implies no more than that. It does not compel a conclusion 
that a person who barters drugs to acquire a firearm has 
used the firearm, as opposed to using the drugs. As we 
explained above, a person who receives a gun has not actively 

employed the gun--that is, he has not "used" it within any 
ordinary understanding of the word "use."

 The Government next argues that the reasoning in War-
wick and Westmoreland is unpersuasive because those cases 
presented "very different factual situations" than the one 
before us. Appellee's Br. at 17. The Government suggests 
that both cases turned on conclusions that the defendants 
merely acquiesced to receiving guns as payment for drugs. 
See id. (citing Warwick, 167 F.3d at 975-76, and Westmore-
land, 122 F.3d at 435-36). In contrast, the Government 
claims that Stewart initiated and negotiated the exchange of 
drugs for guns. We do not understand why this supposed 
factual distinction should affect the purely legal question 
presented in this case. It does not matter whether a drug 
dealer initiates a drugs-for-guns transaction or simply agrees 
to (and does) trade drugs for guns in lieu of money (or some 
other consideration). Under either scenario, the drug dealer 
has not used the gun within the meaning of s 924(c).

 In any case, nothing in the record shows that Stewart or 
any of his co-conspirators initiated the idea of trading their 
drugs for guns. Indeed, the officers first injected guns into 
their discussions by stating that they were "running guns." 
The record reflects that Stewart wanted to obtain guns, but it 
only states that he and his co-conspirators asked to purchase 
the guns for money. While the defendants and the officers 
discussed "the gun transactions" and "finalized the transac-
tion of guns for drugs," nothing in the record shows that the 
defendants asked to trade drugs for the guns. Certainly, the 
defendants agreed to such a transaction, but there is no more 
evidence that they initiated the exchange of drugs (as op-
posed to money) for guns than there was in Westmoreland or 
Warwick.

 Finally, the Government argues that even under the inter-
pretation of "use" we adopt today Stewart's conviction should 
be upheld because he pleaded guilty to conspiring to violate 
s 924(c)(1). In other words, the Government believes that 
Stewart acknowledged he conspired to use a gun in relation 
to a later drug trafficking crime. To buttress this belief, the 

Government cites Stewart's plea colloquy, during which the 
prosecutor claimed that the Government could have proven 
that Stewart "conspired to obtain firearms to use and carry 
them during and in relation to a drug trafficking offense." 
Yet, the Government proffered no facts to support a convic-
tion on this ground. See In re Sealed Case, 153 F.3d 759, 771 
(D.C. Cir. 1998). Furthermore, the signed plea agreement 
does not allude to such a theory. Instead, it merely states 
that Stewart engaged in a "Conspiracy to Obtain One or 
More Firearms During and in Relation to a Drug Trafficking 
Crime."

 III. CONCLUSION

 Although our discussion makes clear that a person who 
receives a gun in exchange for drugs is not using the gun 
under s 924(c), we must remand this case to the district court 
to afford Stewart an opportunity to establish that his proce-
dural default should be excused. As the district court prop-
erly recognized, Stewart's default is excused if he can demon-
strate cause and prejudice, or his actual innocence. See 
Bousley, 523 U.S. at 622. " 'Actual innocence' means factual 
innocence"; it does mean "mere legal insufficiency." Id. at 
623. Accordingly, to establish actual innocence, Stewart must 
demonstrate that " 'in light of all the evidence,' 'it is more 
likely than not that no reasonable juror would have convicted 
him.' " Id. at 623 (quoting Schlup v. Delo, 513 U.S. 298, 327-
28 (1995) (internal quotation omitted)).

 In Bousely, a case whose procedural posture is substantial-
ly similar to the one now before us, the Supreme Court 
provided explicit instructions for how a case such as this one 
should proceed on remand:

 [T]he Government is not limited to the existing record to 
 rebut any showing that the petitioner might make. 
 Rather, on remand, the Government should be permitted 
 to present any admissible evidence of petitioner's guilt 
 even if that evidence was not presented during petition-
 er's plea colloquy and would not normally have been 
 offered before [the Court's] decision in Bailey. In cases 
 
 where the Government has forgone more serious charges 
 in the course of plea bargaining, petitioner's showing of 
 actual innocence must also extend to those charges.
 
Id. at 624 (footnote omitted). For the reasons stated above, 
the district court's judgment is reversed, and the case is 
remanded for further proceedings consistent with this deci-
sion.