(Slip Opinion) OCTOBER TERM, 2007 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## WATSON *v.* UNITED STATES

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 06–571.   Argued October 9, 2007—Decided December 10, 2007

After trading a controlled substance for a pistol, petitioner Watson was
indicted for, *inter alia*, violating 18 U. S. C. §924(c)(1)(A), which sets
a mandatory minimum sentence, depending on the facts, for a defen-
dant who, "during and in relation to any . . . drug trafficking crime[,]
. . . uses . . . a firearm."  The statute does not define "uses," but this
Court has spoken to it twice.  In holding that "a criminal who trades
his firearm for drugs 'uses' it . . . within the meaning of §924(c)(1),"
*Smith* v. *United States*, 508 U. S. 223, 241, the Court rested primarily
on the "ordinary or natural meaning" of the verb in context, *id.,* at
228, understanding its common range as going beyond employment
as a weapon to trading a weapon for drugs, *id.,* at 230.  Later, in
holding that merely possessing a firearm kept near the scene of drug
trafficking is not "use" under §924(c)(1), the Court, in *Bailey* v.
*United States*, 516 U. S. 137, again looked to "ordinary or natural"
meaning, *id.,* at 145, deciding that "§924(c)(1) requires evidence suffi-
cient to show an *active employment* of the firearm by the defendant, a
use that makes the firearm an operative factor in relation to the
predicate offense," *id.,* at 143.  Watson pleaded guilty but reserved
the right to challenge the factual basis for a §924(c)(1)(A) conviction
and sentence.  The Fifth Circuit affirmed on its precedent foreclosing
any argument that Watson had not "used" a firearm.

*Held:* A person does not "use" a firearm under 18 U. S. C. §924(c)(1)(A)
when he receives it in trade for drugs.  Pp. 4–9.

  (a) The Government's position lacks authority in either precedent
or regular English.  Neither *Smith,* which addressed only the trader
who swaps his gun for drugs, not the trading partner who ends up
with the gun, nor *Bailey,* which ruled that a gun must be made use of
actively to satisfy §924(c)(1)(A), decides this case.  With no statutory

definition, the meaning of "uses" has to turn on "everyday meaning" revealed in phraseology that strikes the ear as "both reasonable and normal." *Smith, supra*, 228, 230. When Watson handed over the drugs for the pistol, the officer "used" the pistol to get the drugs, but regular speech would not say that Watson himself used the pistol in the trade. Pp. 4–5.

(b) The Government's first effort to trump ordinary English is rejected. Noting that §924(d)(1) authorizes seizure and forfeiture of firearms "intended to be used in" certain crimes, the Government infers that since some of those offenses involve receipt of a firearm, "use" necessarily includes receipt of a gun even in a barter transaction. The Government's reliance on *Smith* for the proposition that the term must be given the same meaning in both subsections over-reads *Smith*. The common verb "use" is not at odds in the two subsections but speaks to different issues in different voices and at different levels of specificity. Section 924(d)(1) indicates that a gun can be "used" in a receipt crime, but does not say whether both parties to a transfer use the gun, or only one, or which one; however, §924(c)(1)(A) requires just such a specific identification. Pp. 5–7.

(c) Nor is the Government's second effort to trump ordinary English persuasive. It claims that failing to treat receipt in trade as "use" would create unacceptable asymmetry with *Smith; i.e.,* it would be strange to penalize one side of a gun-for-drugs exchange but not the other. The problem is not with *Smith,* however, but with the limited malleability of the language it construed, and policy-driven symmetry cannot turn "receipt-in-trade" into "use." Whatever the tension between the prior result and the outcome here, law depends on respect for language and would be served better by statutory amendment than by racking statutory language to cover a policy it fails to reach. Pp. 8–9.

191 Fed. Appx. 326, reversed and remanded.

SOUTER, J., delivered the opinion of the Court, in which ROBERTS, C. J., and STEVENS, SCALIA, KENNEDY, THOMAS, BREYER, and ALITO, JJ., joined. GINSBURG, J., filed an opinion concurring in the judgment.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 06–571

## MICHAEL A. WATSON, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[December 10, 2007]

JUSTICE SOUTER delivered the opinion of the Court.

The question is whether a person who trades his drugs for a gun "uses" a firearm "during and in relation to . . . [a] drug trafficking crime" within the meaning of 18 U. S. C. §924(c)(1)(A).[1] We hold that he does not.

## I
## A

Section 924(c)(1)(A) sets a mandatory minimum sentence, depending on the facts, for a defendant who, "during and in relation to any crime of violence or drug trafficking crime[,] . . . uses or carries a firearm."[2] The statute leaves the term "uses" undefined, though we have spoken to it twice before.

*Smith* v. *United States*, 508 U. S. 223 (1993) raised the converse of today's question, and held that "a criminal who

---

[1] Formerly 18 U. S. C. §924(c)(1) (1994 ed.).

[2] Any violation of §924(c)(1)(A), for example, demands a mandatory minimum sentence of 5 years. See 18 U. S. C. §924(c)(1)(A)(i). If the firearm is brandished, the minimum goes up to 7 years, see §924(c)(1)(A)(ii); if the firearm is discharged, the minimum jumps to 10 years, see §924(c)(1)(A)(iii).

trades his firearm for drugs 'uses' it during and in relation to a drug trafficking offense within the meaning of §924(c)(1)." *Id.*, at 241.  We rested primarily on the "ordinary or natural meaning" of the verb in context, *id.,* at 228, and understood its common range as going beyond employment as a weapon: "it is both reasonable and normal to say that petitioner 'used' his MAC–10 in his drug trafficking offense by trading it for cocaine," *id.,* at 230.

Two years later, the issue in *Bailey* v. *United States*, 516 U. S. 137 (1995) was whether possessing a firearm kept near the scene of drug trafficking is "use" under §924(c)(1). We looked again to "ordinary or natural" meaning, *id.,* at 145, and decided that mere possession does not amount to "use": "§924(c)(1) requires evidence sufficient to show an *active employment* of the firearm by the defendant, a use that makes the firearm an operative factor in relation to the predicate offense," *id.,* at 143.[3]

B

This third case on the reach of §924(c)(1)(A) began to take shape when petitioner, Michael A. Watson, told a Government informant that he wanted to acquire a gun. On the matter of price, the informant quoted no dollar figure but suggested that Watson could pay in narcotics. Next, Watson met with the informant and an undercover law enforcement agent posing as a firearms dealer, to whom he gave 24 doses of oxycodone hydrocholoride (commonly, OxyContin) for a .50 caliber semiautomatic pistol.  When law enforcement officers arrested Watson, they found the pistol in his car, and a later search of his house turned up a cache of prescription medicines, guns,

_____

[3] In 1998, Congress responded to *Bailey* by amending §924(c)(1).  The amendment broadened the provision to cover a defendant who "in furtherance of any [crime of violence or drug trafficking] crime, possesses a firearm."  18 U. S. C. §924(c)(1)(A).  The amendment did not touch the "use" prong of §924(c)(1).

and ammunition. Watson said he got the pistol "to protect his other firearms and drugs." App. to Pet. for Cert. 11a.

A federal grand jury indicted him for distributing a Schedule II controlled substance and for "using" the pistol during and in relation to that crime, in violation of §924(c)(1)(A).[4] Watson pleaded guilty across the board, reserving the right to challenge the factual basis for a §924(c)(1)(A) conviction and the added consecutive sentence of 60 months for using the gun. The Court of Appeals affirmed, 191 Fed. Appx. 326 (CA5 2006) *(per curiam)*, on Circuit precedent foreclosing any argument that Watson had not "used" a firearm, see *id.,* at 327 (citing *United States* v. *Ulloa*, 94 F. 3d 949 (CA5 1996) and *United States* v. *Zuniga*, 18 F. 3d 1254 (CA5 1994)).

We granted certiorari to resolve a conflict among the Circuits on whether a person "uses" a firearm within the meaning of 18 U. S. C. §924(c)(1)(A) when he trades narcotics to obtain a gun.[5] 549 U. S. \_\_\_ (2007). We now

——————

[4] The grand jury also indicted Watson as a felon in possession of a firearm, in violation of §922(g)(1). This count referred to the five firearms found in Watson's house, but not the pistol he got for the narcotics.

[5] Compare *United States* v. *Cotto*, 456 F. 3d 25 (CA1 2006) (trading drugs for a firearm constitutes "use" of the firearm under §924(c)(1)(A)); *United States* v. *Sumler*, 294 F. 3d 579 (CA3 2002) (same); *United States* v. *Ramirez-Rangel*, 103 F. 3d 1501 (CA9 1997) (same); *United States* v. *Ulloa*, 94 F. 3d 949 (CA5 1996) (same); *United States* v. *Cannon*, 88 F. 3d 1495 (CA8 1996) (same), with *United States* v. *Montano*, 398 F. 3d 1276 (CA11 2005) *(per curiam)* (defendant did not "use" a firearm within the meaning of §924(c)(1)(A) when he traded drugs for a firearm); *United States* v. *Stewart*, 246 F. 3d 728 (CADC 2001) (same); *United States* v. *Warwick*, 167 F. 3d 965 (CA6 1999) (same); *United States* v. *Westmoreland*, 122 F. 3d 431 (CA7 1997) (same). The Fourth Circuit has held that a defendant "used" a firearm where he gave cocaine base to a compatriot in exchange for assistance in obtaining a gun. See *United States* v. *Harris*, 39 F. 3d 1262 (1994). Subsequent unpublished opinions in that Circuit have relied on *Harris* for the proposition that the receipt of a firearm in exchange for drugs constitutes use of the firearm. See, *e.g., United States* v. *Belcher*, No.

reverse.

## II

### A

The Government's position that Watson "used" the pistol under §924(c)(1)(A) by receiving it for narcotics lacks authority in either precedent or regular English. To begin with, neither *Smith* nor *Bailey* implicitly decides this case. While *Smith* held that firearms may be "used" in a barter transaction, even with no violent employment, see 508 U. S*.,* at 241, the case addressed only the trader who swaps his gun for drugs, not the trading partner who ends up with the gun. *Bailey*, too, is unhelpful, with its rule that a gun must be made use of actively to satisfy §924(c)(1)(A), as "an operative factor in relation to the predicate offense." 516 U. S., at 143. The question here is whether it makes sense to say that Watson employed the gun at all; *Bailey* does not answer it.

With no statutory definition or definitive clue, the meaning of the verb "uses" has to turn on the language as we normally speak it, see, *e.g., Lopez* v. *Gonzales*, 549 U. S. ___, ___ (2006) (slip op., at 5); *Asgrow Seed Co.* v. *Winterboer*, 513 U. S. 179, 187 (1995); *FDIC* v. *Meyer*, 510 U. S. 471, 476 (1994); there is no other source of a reasonable inference about what Congress understood when writing or what its words will bring to the mind of a careful reader. So, in *Smith* we looked for "everyday meaning," 508 U. S*.,* at 228, revealed in phraseology that strikes the ear as "both reasonable and normal," *id.*, at 230. See also *Bailey, supra,* at 145. This appeal to the ordinary leaves the Government without much of a case.

The Government may say that a person "uses" a firearm simply by receiving it in a barter transaction, but no one else would. A boy who trades an apple to get a granola bar

---

98–4845, 1999 WL 1080103 (CA4, Nov. 29, 1999) *(per curiam).*

is sensibly said to use the apple, but one would never guess which way this commerce actually flowed from hearing that the boy used the granola. Cf. *United States* v. *Stewart*, 246 F. 3d 728, 731 (CADC 2001) ("[W]hen a person pays a cashier a dollar for a cup of coffee in the courthouse cafeteria, the customer has not used the coffee. He has only used the dollar bill"). So, when Watson handed over the drugs for the pistol, the informant or the agent[6] "used" the pistol to get the drugs, just as *Smith* held, but regular speech would not say that Watson himself used the pistol in the trade. "A seller does not 'use' a buyer's consideration," *United States* v. *Westmoreland*, 122 F. 3d 431, 436 (CA7 1997), and the Government's contrary position recalls another case; *Lopez, supra,* at ___ (slip op., at 7), rejected the Government's interpretation of 18 U. S. C. §924(c)(2) because "we do not normally speak or write the Government's way."[7]

## B

The Government would trump ordinary English with two arguments. First, it relies on *Smith* for the pertinence of a neighboring provision, 18 U. S. C. §924(d)(1), which authorizes seizure and forfeiture of firearms "intended to be used in" certain criminal offenses listed in §924(d)(3). Some of those offenses involve receipt of a firearm,[8] from

_____

[6] The record does not say which.

[7] Dictionaries confirm the conclusion. "Use" is concededly "elastic," *Smith* v. *United States*, 508 U. S. 223, 241 (1993) (SCALIA, J., dissenting), but none of its standard definitions stretch far enough to reach Watson's conduct, see, *e.g.,* Webster's New International Dictionary of the English Language 2806 (2d ed. 1939) ("to employ"); The Random House Dictionary of the English Language 2097 (2d ed. 1987) (to "apply to one's own purposes"; "put into service; make use of"); Black's Law Dictionary 1541 (6th ed. 1990) ("[t]o avail oneself of; . . . to utilize"); see also *Smith, supra,* at 228–229 (listing various dictionary definitions).

[8] See, *e.g.,* 18 U. S. C. §922(j) (prohibiting, *inter alia,* the receipt of a stolen firearm in interstate commerce); §924(b) (prohibiting, *inter alia,*

which the Government infers that "use" under §924(d) necessarily includes receipt of a gun even in a barter transaction. *Smith* is cited for the proposition that the term must be given the same meaning in both subsections, and the Government urges us to import "use" as "receipt in barter" into §924(c)(1)(A).

We agree with the Government that §924(d) calls for attention; the reference to intended use in a receipt crime carries some suggestion that receipt can be "use" (more of a hint, say, than speaking of intended "use" in a crime defined as exchange). But the suggestion is a tepid one and falls short of supporting what is really an attempt to draw a conclusion too specific from a premise too general.

The *Smith* majority rested principally on ordinary speech in reasoning that §924(c)(1) extends beyond use as a weapon and includes use as an item of barter, see 508 U. S., at 228–230, and the *Smith* opinion looks to §924(d) only for its light on that conclusion. It notes that the "intended to be used" clause of §924(d)(1) refers to offenses where "the firearm is *not* used as a weapon but instead as an item of barter or commerce," *id.,* at 234, with the implication that Congress intended "use" to reach commercial transactions, not just gun violence, in §924(d) generally, see *id.,* at 234–235. It was this breadth of treatment that led the *Smith* majority to say that, "[u]nless we are to hold that using a firearm has a different meaning in §924(c)(1) than it does in §924(d)—and clearly we should not—we must reject petitioner's narrow interpretation." *Id.,* at 235 (citation omitted); see also *Bailey, supra,* at 146 ("[U]sing a firearm should not have a different meaning in §924(c)(1) than it does in §924(d)" (internal quotation marks omitted)).

The Government overreads *Smith*. While the neighbor-

_____

the receipt of a firearm in interstate commerce with the intent to commit a felony).

ing provision indicates that a firearm is "used" nonoffensively, and supports the conclusion that a gun can be "used" in barter, beyond that point its illumination fails. This is so because the utility of §924(d)(1) is limited by its generality and its passive voice; it tells us a gun can be "used" in a receipt crime, but not whether both parties to a transfer use the gun, or only one, or which one. The nearby subsection (c)(1)(A), however, requires just such a specific identification. It provides that a person who uses a gun in the circumstances described commits a crime, whose perpetrator must be clearly identifiable in advance.

The agnosticism on the part of §924(d)(1) about who does the using is entirely consistent with common speech's understanding that the first possessor is the one who "uses" the gun in the trade, and there is thus no cause to admonish us to adhere to the paradigm of a statute "as a symmetrical and coherent regulatory scheme, . . . in which the operative words have a consistent meaning throughout," *Gustafson* v. *Alloyd Co.*, 513 U. S. 561, 569 (1995), or to invoke the "standard principle of statutory construction . . . that identical words and phrases within the same statute should normally be given the same meaning," *Powerex Corp.* v. *Reliant Energy Services, Inc.*, 551 U. S. \_\_\_, \_\_\_ (2007) (slip op., at 7). Subsections (d)(1) and (c)(1)(A) as we read them are not at odds over the verb "use"; the point is merely that in the two subsections the common verb speaks to different issues in different voices and at different levels of specificity. The provisions do distinct jobs, but we do not make them guilty of employing the common verb inconsistently.[9]

––––––––––

[9] For that matter, the Government's argument that "use" must always have an identical meaning in §§924(c)(1)(A) and 924(d)(1) would upend *Bailey* v. *United States*, 516 U. S. 137 (1995). One of the relevant predicate offenses referred to by §924(d)(1) is possession of "any stolen firearm . . . [in] interstate or foreign commerce." 18 U. S. C. §922(j). If we were to hold that all criminal conduct covered by the

## C

The second effort to trump regular English is the claim that failing to treat receipt in trade as "use" would create unacceptable asymmetry with *Smith*. At bottom, this atextual policy critique says it would be strange to penalize one side of a gun-for-drugs exchange but not the other: "[t]he danger to society is created not only by the person who brings the firearm to the drug transaction, but also by the drug dealer who takes the weapon in exchange for his drugs during the transaction," Brief for United States 23.

The position assumes that *Smith* must be respected, and we join the Government at least on this starting point. A difference of opinion within the Court (as in *Smith*) does not keep the door open for another try at statutory construction, where *stare decisis* has "special force [since] the legislative power is implicated, and Congress remains free to alter what we have done." *Patterson* v. *McLean Credit Union*, 491 U. S. 164, 172–173 (1989). What is more, in 14 years Congress has taken no step to modify *Smith*'s holding, and this long congressional acquiescence "has enhanced even the usual precedential force" we accord to our interpretations of statutes, *Shepard* v. *United States*, 544 U. S. 13, 23 (2005).

The problem, then, is not with the sturdiness of *Smith* but with the limited malleability of the language *Smith* construed, and policy-driven symmetry cannot turn "receipt-in-trade" into "use." Whatever the tension between the prior result and the outcome here, law depends on respect for language and would be served better by statutory amendment (if Congress sees asymmetry) than by

_____

"intended to be used" clause in §924(d)(1) is "use" for purposes of §924(c)(1)(A), it would follow that mere possession is use. But that would squarely conflict with our considered and unanimous decision in *Bailey* that "'use' must connote more than mere possession of a firearm." 516 U. S., at 143.

racking statutory language to cover a policy it fails to reach.

The argument is a peculiar one, in fact, given the Government's take on the current state of §924(c)(1)(A). It was amended after *Bailey* and now prohibits not only using a firearm during and in relation to a drug trafficking crime, but also possessing one "in furtherance of" such a crime. 18 U. S. C. §924(c)(1)(A); see n. 3, *supra*. The Government is confident that "a drug dealer who takes a firearm in exchange for his drugs generally will be subject to prosecution" under this new possession prong. Brief for United States 27; see Tr. of Oral Arg. 41 (Watson's case "could have been charged as possession"); cf. *United States* v. *Cox*, 324 F. 3d 77, 83, n. 2 (CA2 2003) ("For defendants charged under §924(c) after [the post-*Bailey*] amendment, trading drugs for a gun will probably result in . . . possession [in furtherance of a drug trafficking crime]"). This view may or may not prevail, and we do not speak to it today, but it does leave the appeal to symmetry underwhelming in a contest with the English language, on the Government's very terms.

* * *

Given ordinary meaning and the conventions of English, we hold that a person does not "use" a firearm under §924(c)(1)(A) when he receives it in trade for drugs. The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

———————

No. 06–571

———————

## MICHAEL A. WATSON, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[December 10, 2007]

JUSTICE GINSBURG, concurring in the judgment.

It is better to receive than to give, the Court holds today, at least when the subject is guns. Distinguishing, as the Court does, between trading a gun for drugs and trading drugs for a gun, for purposes of the 18 U. S. C. §924(c)(1) enhancement, makes scant sense to me. I join the Court's judgment, however, because I am persuaded that the Court took a wrong turn in *Smith* v. *United States*, 508 U. S. 223 (1993), when it held that trading a gun for drugs fits within §924(c)(1)'s compass as "us[e]" of a firearm "during and in relation to any . . . drug trafficking crime." For reasons well stated by JUSTICE SCALIA in his dissenting opinion in *Smith,* 508 U. S., at 241, I would read the word "use" in §924(c)(1) to mean use as a weapon, not use in a bartering transaction. Accordingly, I would overrule *Smith*, and thereby render our precedent both coherent and consistent with normal usage. Cf. *Henslee* v. *Union Planters Nat. Bank & Trust Co.*, 335 U. S. 595, 600 (1949) (Frankfurter, J., dissenting) ("Wisdom too often never comes, and so one ought not to reject it merely because it comes late.").